# CHARLESTON

PARDEE *et al* v. C. CRANE & CO.

Submitted January 27, 1914. Decided May 12, 1914.

1. LOGS AND LOGGING—*Sale of Timber—Construction of Conveyances.*

Two papers vesting interests in the same tract of land, executed by the same person, the then owner of the tract, and delivered to two different persons, at the same time, with notice of the contents thereof to each, one an executory contract of sale of the land and the other a deed conveying timber thereon, are read and considered

74 W. Va.

together and as one paper, upon an inquiry as to the character and extent of the timber right so conveyed. (p. 370).

2. VENDOR AND PURCHASER—*Outstanding Option—Knowledge of Purchaser.*

A third person who, with notice of the equity of the holder of an option on land, purchases the same from the optionor, takes it subject to the rights of the holder of the option, and holds it in trust of him. (p. 371).

3. PRINCIPAL AND AGENT—*Rights of Principal.*

An agent is not permitted to hold, against his principal, the fruits of the exercise of his representative powers. (p. 371).

4. SAME—*Relation—Necessity of Compensation.*

Payment of a money compensation for services is not essential to the existence of the relation of principal and agent. (p. 371).

5. SAME—*Double Agency—Duties of Agent.*

An agent representing both parties to a transaction, with their knowledge and consent, cannot by contract with one of them, without the consent of the other, acquire an interest in the subject matter of the agency, to the detriment of the non-consenting principal. (p. 371).

Appeal from Circuit Court, Wyoming County.

Bill by Calvin Pardee and others against C. Crane & Co. Decree for defendant, and plaintiffs appeal.

*Reversed, and decree for plaintiffs.*

*Wesley K. Woodbury, Brown, Jackson & Knight* and *Angus W. McDonald,* for appellants.

*Campbell, Brown & Davis,* for appellee.

POFFENBARGER, JUDGE:

This appeal from a final decree dismissing a bill to enjoin the cutting of certain kinds of timber on about 3500 acres of land, as not having been included in certain deeds for timber on said land, involves the construction of one of said deeds.

Alfred Buskirk, then owner of the land, by an executory contract dated October 9th 1899, sold to C. Crane and Company, a corporation, "all the merchantable poplar, lynn, cucumber, ash and white oak" standing timber thereon of certain specified dimensions at certain prices, dependent upon the size and character of the trees, and permitted removal of the same within 20 years. The sale was conditional upon

approval of the title of the vendor and a period of 20 days was allowed for determination of its validity, at the end of which, if the title should be satisfactory, $5000.00 was to be paid in cash, on account of the purchase money, and a deed executed. The balance of the purchase money was to be evidenced by a note or notes, and the timber was to be counted and branded within 90 days.

On January 6th 1900, a deed was executed, conveying 4946 large poplar, lynn, cucumber, and ash trees, 3150 small trees of the same kinds and 690 white oak trees, all branded as required by the contract, in consideration of $16034.00, of which $8600.00 had been paid in cash, and the residue, evidenced by two notes, was deferred and a vendors lien was reserved to secure payment thereof.

The lands on which this timber stood were practically surrounded by lands owned, in part by Calvin Pardee and, in part, by Pardee and others, represented by Wesley K. Woodbury of Pottsville, Pa., and C. Crane and Company had previously purchased all the timber on their said lands. Calvin Pardee had conveyed the timber on his lands to Crane and Co. by deed, dated December 16th 1899. He and Woodbury had contracted the sale of the timber on the other adjacent lands by an agreement, dated Oct. 14th 1899, and it was conveyed by a deed dated, Jany. 15th 1901.

Before Crane and Company obtained a deed for the timber on the Buskirk land, for which they had contracted, they recommended to Pardee and Woodbury the purchase of the Buskirk land. As early as Oct. 20th 1899, they advised Pardee to buy it. On Nov. 1st 1899, they wrote Woodbury a letter, in reply to one of his, dated Oct. 28th, saying they had bought the timber, and expressing the opinion that the land could be bought in the near future for $1.25 or $1.50 an acre. On April 17th, 1900, Woodbury wrote C. Crane, referring to an interview they had had at Charleston in which they had planned out certain work, and expressing a desire to purchase the Buskirk land at once, if a satisfactory price could be agreed upon. He made a further inquiry about it June 16th 1900. Crane wrote Woodbury, June 18th 1900, expressing belief that he could buy it for him at $1.50 per acre and urging him to buy it. On June 21st, Woodbury authorized

Crane to obtain an option on it at a price not exceeding $2.00 per acre. On June 26th, Crane wrote, saying he though he could get it for $7,500.00. To this Woodbury assented, June 30th. On July 18th, Crane advised the deal could not be closed until after Aug. 1st on account of an option held by parties in Columbus, Ohio, but expressing belief that Buskirk would accept the offer. In August, 1900, the price was agreed upon at $8750.00 and a formal contract of purchase was entered into, December 24th 1900.

The letter to Pardee as well as all the letters to Woodbury seem to have been signed by C. Crane & Co. but written by C. Crane. Some of Woodbury's were addressed to the company and others to C. Crane, who was the treasurer and general manager of his company. Crane & Co. were largely indebted to Pardee and Woodbury's principals for the timber purchased from them and it was agreed between Woodbury and Crane that Crane & Co. should pay Buskirk for the timber out of the money due from them. Their relations seem to have been close and friendly until sometime in 1904, when Crane & Co. began to assert larger rights respecting the timber on the land than its owners were willing to admit. This claim arises under a second deed to Crane & Co. from Buskirk for timber, dated, July 3rd 1900, acknowledged, Dec. 24th 1900, the date of the contract of sale of the land to Woodbury, and recorded, Jany. 15th 1901.

It conveyed to C. Crane & Co., in consideration of $500.00, "all the merchantable timber not heretofore sold to the said C. Crane and Company, as evidenced by a deed now of record in the County Clerk's office of Logan County, said timber being on a tract of about 3500 acres on Buffalo and Hjuffs Creek in Logan and Wyoming Counties, and being the same tract of land purchased by the said Alfred Buskirk from John B. Wilkinson and John A. Sheppard and formerly known as the Sheppard and Ellison lands. And the said C. Crane and Company are to have Twenty years from this date in which to remove said timber with all the necessary rights of way for the cutting and removing of said timber from off said lands. The timber herein conveyed includes only the unbranded timber of all kinds—that heretofore sold being branded 'C. C.'."

This deed is interpreted by the defendant as vesting in it title to all the merchantable timber of every kind on the land at the date of the delivery thereof and all that shall become merchantable within the period of 20 years, allowed for removal thereof. Accordingly it has cut over a portion of the land three times, in 1900, 1901 and 1904, and insists upon its right to go over it as many times as may be necessary to obtain all the timber that shall become merchantable upon it within the 20 year period.

On the other hand, it is interpreted by the plaintiffs, in view of the contemporaneous conditions, usage and practice among the timber dealers and the conduct of the defendant, as agent of the plaintiffs, in the negotiation of the purchase of the land, as having conveyed only such poplar, lynn, cucumber, ash and white oak timer as the defendant was entitled to under its contract of purchase, dated, Oct. 9th 1899, and had not been conveyed to it by the deed of Jany. 6th 1900. In support of this position, they have taken the testimony of numerous witnesses to the effect that during the period in which the sales and conveyances here involved, were made, no timber was regarded as merchantable, in the community in which the timber in question was located, except the five classes or kinds mentioned in the contract of Oct. 9th 1899, and the deed of Jany. 6th 1900. They have also put in evidence numerous certified copies of deeds, made within and near said period, conveying standing timber, some of it to Crane & Cole, predecessors of C. Crane and Co. and to C. Crane & Co., showing that generally only such timber was purchased for manufacture and sale. While the negotiations were in progress, Crane wrote Woodbury that, in case he should purchase, he would get all the small timber of the five species mentioned in the contract of sale of Oct. 9th 1899. In his letter of July, 18th 1900, he said: "We bought the Oak, Poplar, Hemlock, Ash and Cucumber off the land when we traded, but all the small timber, Beech, Maple and a great deal of other timber will be left on the land, which will be worth something. I think in connection with your land, it will be worth at least fifty cents an acre." Only six days later, Woodbury made his offer of $7500.00 for the land. While Crane & Co. were not paid anything for their services in the

Woodbury purchase, there was a manifest and distinct benefit to them in the transaction, since there were boundary controversies or, at least, uncertainties, between Woodbury's clients and Buskirk, which embarrassed Crane & Co. as purchasers of the timber on both sides of the lines. As long as the interfering tracts remained in separate ownership, there was danger of delay of cutting, pending settlement of the boundary disputes. By the Woodbury purchase of the Buskirk land, putting the lands on both sides in the same ownership, this danger was obviated. The cutting could proceed and the settlement would be a mere matter of accounting, and if, in such purchase, the boundary lines could be settled, all uncertainty would be wholly eliminated. In his letter of June 26th, Crane said: "This would save a great deal of annoyance and a great deal of running of lines and surely it is the best and grandest thing you people can do, as it would make your body of land complete." This embarrassment was recognized in the first deed from Buskirk to Crane & Co. A survey of the land, known as the Sell survey, had been made, but the correctness thereof seems to have been doubted. Accordingly the deed provided for contingencies. If Buskirk had more land than was included in the Sell survey, the trees on his land outside thereof were to be counted, branded, paid for and conveyed, agreeably to the terms of the original contract; and, if any of the trees conveyed should be found not to be on his land, they were to be charged back to Buskirk at the contract prices. In view of this situation, a purchase by Woodbury, eliminating all boundary disputes and the possibility thereof, was obviously beneficial to Crane & Co. They recommended such purchase according to the Sell survey and it was so made. Thus their title to the trees conveyed by Buskirk was practically cleared up and put beyond question.

Being thus substantially interested and representing Woodbury in the purchase of the lands, through their general manager, Crane & Co., on the very day of the closing of the contract between Woodbury and Buskirk, and, while closing it themselves for Woodbury, took the second deed from Buskirk, the granting part of which has been hereinbefore quoted, and claim not only to have acquired, by it, title to all timber of every description on the land that is merchantable in any

sense, or shall become so within the 20 year period, but also to have abrogated important stipulations in the first deed, preventing recutting over the land and requiring the cutting of the timber in territorial sections and surrender of the sections immediately upon the removal therefrom of such timber as the vendees were entitled to cut. As has been stated, this deed was dated, July 3rd 1900, acknowledged Dec. 24th 1900 and recorded, Jany. 15th 1901.

Against the alleged estoppel of Crane & Co. to claim anything under said deed, except merchantable poplar, lynn, cucumber, ash and white oak of the sizes specified in their contract of Oct. 9th 1899, Woodbury's admitted notice of the existence thereof, before he obtained his deed under his executory contract, is set up and relied upon. It was not executed until April 30th 1901, more than three months after the recordation of the second deed from Buskirk to Crane & Co., nor finally delivered until a still later date; and, before the transaction was finally closed, Woodbury had an abstract of the title made, showing said second deed. Moreover Crane swears positively and emphatically that he told Woodbury over and over that he claimed all the timber on the land and Woodbury's denial of the truth of this statement is neither direct nor very positive. He admits that, as early as May, 1901, Crane had told him he claimed all of it. His admission is in the following terms; "When I testified before, I had no recollection of Mr. Crane claiming all the timber until this controversy arose in 1903. Nevertheless, in May, 1901, I find that I suggested in a letter to one of my clients that an examination be made for timber contracts, as Mr. Crane had once claimed he owned all the timber. However, any such claim must have been made after he purchased the property for us, and the consideration was agreed upon." He had previously testified that he recollected no information modifying the letter of July 18th, prior to the making of the contract of purchase with Buskirk. His executory contract of purhcase made the following exception: "such timber as has been heretofore sold to C. Crane & Co.;" and the deed made an exception in these words; "all the timber rights and other privileges in and on said land heretofore conveyed and now vested in C. Crane & Co."

As to what was generally regarded as merchantable timber at the time of the transaction in question, the evidence is highly conflicting. Numerous witnesses testified that, for many years, all varieties of timber along the Guyandotte River and its tributaries, all the species of pine, poplar, oak and maple, and in addition thereto, hickory, beech, walnut, cherry, gum and buckeye, have been marketed from that region of country. This is controverted by the testimony of other witnesses, but it seems to preponderate in favor of the defendant. It covers a wider range and is more direct and positive in character. The documentary evidence as to what kinds of timber were dealt in is by no means conclusive. There is a very decided lack of uniformity. The kinds of timber conveyed seem to have depended in each case upon the preference or demand of the vendee, poplar, cucumber, ash and lynn predominating. One deed conveyed poplar, ash, cucumber and yellow lynn; another, poplar, ash, yellow lynn and walnut; another, poplar, ash, cucumber, lynn, chestnut oak and white oak; another, "all the timber of various kinds;" another, poplar, ash, cucumber, lynn, white oak, red oak, burr oak and hemlock; another, poplar, ash, cucumber and oak; another, poplar, cucumber, ash and white oak; another, cucumber, ash, poplar and oak; another, poplar only; another, oak, poplar and cucumber; and another, oak only. These deeds do not record all the timber transactions of the region by any means. No doubt the owners of tens of thousands of acres cut the timber from their own lands and marketed it, and the oral testimony shows all sorts of timber were floated out of the Guyandotte River for many years past.

Though the terms "merchantable timber," used in said second deed, cannot be restricted to the five varieties mentioned in the contract of Oct. 9th 1899, by any local custom or usage, on account of lack of proof of its existence, the facts and circumstances attending the execution of said second deed and the relation of the parties to one another might have been such as so to limit them, since they have no inflexible meaning in law. As between the immediate parties to a deed or contract and others who participated in the execution thereof, the meaning of such words is sometimes made to yield to the sense in which they were used, to the end that the intent and

purpose of the parties may be effectuated. "The term 'merchantable' is not one that the law can define: and the sense in which it was used must be left to the determination of the jury." *Ragland* v. *Butler*, 18 Gratt. 336.

The immediate parties to the deed being Buskirk and C. Crane & Co., their situation and purposes and the surrounding circumstances must be considered. The original contract between them was still alive for some purpose, for the deed of Jany. 6th 1900, kept it in force. Buskirk was bound to refund the purchase money of such trees, conveyed by the deed, as were not on his land, and to convey such trees on his land as had been omitted from the deed. Whether any trees had been omitted does not appear, but about $1000.00 or $1200.00 worth had been erroneously included, according to the testimony of Crane, but that was correctible by deduction from the deferred portion of the purchase money, and that seems not to have been paid at the time, since, it is said, care was taken to preserve the vendor's lien. Crane insists, however, that this item was part of the consideration of the conveyance of timber made by the second deed. At the same time, he says he wanted Woodbury to let him settle with Buskirk in full for the land, so he could retain it out of that fund. In connection with these contradictory facts and statements as to the consideration of the deed, we must consider its recital of only $500.00 and Crane's representation to Woodbury, in his letter of July 18th, that the timber to be left on the land would be worth 50 cents an acre to his people as owners of the land, or about $1750.00. By some means, not clearly shown, Buskirk retained the walnut timber on the land and conveyed it to one Fantine Buskirk by a deed, dated July 28th 1902. By the same deed, he assigned and set over to her the $500.00 due from Crane & Co. as purchase money, under said second deed, and she assumed the payment of the amount due Crane & Co. for shortage of the timber conveyed by said first deed. Crane & Co. are to market the walnut timber and pay themselves a balance of $750.00 out of its proceeds, according to the testimony of C. Crane. It is somewhat difficult to perceive the right of Buskirk to the walnut timber, after having conveyed to Crane & Co. "all the merchantable timber"

on the land, if "merchantable" is to have the effect claimed for it by Crane & Co.

However, in as much as Buskirk parted with the equitable title to the land in the same instant in which he conveyed the timber to Crane & Co., the contract and the deed may be considered and read together and Woodbury considered as a party to the deed, for the purposes of its construction and operation. Crane & Co. knew he was contracting for the land in the condition in which it was at the time of his acceptance of Buskirk's proposal of sale, and he had notice of Crane & Co's. contract of Oct. 9th 1899 and their deed of Jany. 6th 1900. Woodbury accepted the offer Aug. 28, 1900, and it is not pretended that Crane & Co. had at that time acquired title to the small timber. Though the second deed was dated July 3rd 1900, Crane admits it was not delivered before the following December, and likely would have never been delivered in the form in which it was prepared, if Woodbury had not bought the land. Speaking of his deed, Crane says: "The contract was all made, and very probably, I think, Buskirk signed it in our office on that day, (July 3rd), but he took it to Logan for his wife to execute, or took it there any way.     *
*     *     *     We were all busy, and it run along, and I don't think it was finished up, from some cause, until they made the contract with you, (Woodbury), for the land, and very probably they made up their minds to back out of that deed if they hadn't made the deal with you. From some cause the deed was not signed and put on record and returned to you before that time." Though Crane says he told both Woodbury and Pardee he had bought, or intended to buy, all the timber on the land, he evidently had not done so up to July 18th 1900, when he wrote Woodbury that "all the small timber, beech, maple and a great deal of other timber" would be left on the land. If he then had any agreement to purchase such timber, it was a mere verbal one and Woodbury had no notice of it, for it is inconceivable that Crane would have written that letter, after having given notice of his ownership of all the timber. Surely beech and maple were merchantable timber. According to his own testimony, he had no real hold upon it, until the date of the contract between Buskirk and Woodbury. When the deed was actually delivered he does

not say, nor does it appear. The certificate of acknowledgment thereof and Woodbury's contract bear the same date. The down payment under the Woodbury contract was not made until Jany. 14th 1901, and, on the next day, Jany. 15th 1901, the Crane & Co. deed was admitted to record. So the circumstances indicate that it was not delivered until the $1000.00 was paid by Crane & Co. for Woodbury. The receipt is dated at Logan Court House, and there the deed was admitted to record one day later. Crane's testimony, read in the light of these facts, carries conviction that there was no delivery of the deed, until Buskirk knew he was parting with the land under a binding contract with Woodbury. Obviously therefore, Buskirk's two acts, delivery of his contract to Woodbury and delivery of his deed to Crane, must have been contemporaneous and constituted a single transaction, so far as he was concerned. Otherwise his double purpose to sell both land and timber, the former to Woodbury and the latter to Crane, would not have been accomplished, for his intention not to let the timber go, until the land was sold, is apparent and he could not first sell the land including the timber on it and then sell the timber.

Crane & Co. cannot separate themselves from this single purpose of Buskirk. They made themselves parties to it in their own right and as agents for Woodbury. Buskirk as owner of the subject matter of the contracts, was master of the situation. Both of the other parties derived their rights through and under him, and Crane & Co. in their own right and as agents for Woodbury, voluntarily submitted themselves to his will and purpose.

It follows, therefore, notwithstanding any representations made by Crane to Woodbury as to what he had done or intended to do, respecting the timber, he had not bought anything other than the timber covered by his original contract, before the date of Woodbury's contract of purchase, and that contract made only this exception: "such timber as has been heretofore sold to C. Crane & Co." Manifestly it does not except the small timber of the five specified kinds nor any other kind, because it had not been theretofore sold, so far as Woodbury knew, nor at all, because Crane admits any contract his company had for it was conditional upon the sale of the land to

Woodbury. It belonged to Buskirk and was part and parcel of the land, at the date of his quotation of the price therefor, through Crane & Co., and when Woodbury signified his willingness to take it at the price quoted, and also at the date of the delivery of the papers, and the contract, vesting equitable title in Woodbury's clients, necessarily included it. Of all this Crane & Co. admittedly had notice, for they were on the ground and actually transacted the business for Woodbury.

Having such notice, and claiming under Buskirk, they must be regarded as virtual parties to both papers, just as Woodbury was through their agency, and the two papers must be read together as one, respecting the title to the timber. As the terms of the contract are clear, certain and inflexible, and the terms of the deed can be made to yield by construction and interpretation, as has been shown, the former necessarily prevails and limits the timber right conveyed by the deed to the five kinds of timber, dimensions, terms and conditions, set forth in the contract of Oct. 9th 1899 and the deed of Jany. 6th 1900. In other words, the deed is held to have been, in legal effect, a mere supplementary one, known among timber dealers as a "clean up" deed, having for its purpose the perfection of Crane & Co.'s title under their original contract of purchase.

Crane & Co. and Woodbury stood in a relation decidedly analogous to that of tenants in common. By contract with Buskirk, they were dividing a certain thing, the tract of land. Though not owners in law or fact, they were prospective owners of separate interests, and contemplated relationship in the final result, as in the case of copartners or other tenants in common. This community of interest in negotiation logically and morally imposed the same obligation as community of interest in the land itself. That they were not formal parties to both papers does not bar the application of the principle here referred to. The transaction was, in substance and effect, a single one and affected a single subject matter, working a practical partition thereof, and both papers were executed on one side by the same party. Identity of the parties to all the papers is not essential to the application of the rule of construction. *Roush* v. *Miller,* 39 W. Va. 638; *Gilliam* v. *Moore,* 4 Leigh 30; *Coffman* v. *Coffman,* 79 Va. 504; *White* v. *Bro-*

*caw,* 14 Ohio St. 339; *Ford* v. *Belmont,* 7 Rob. (N. Y.) 97; *Robbins* v. *Webb,* 68 Ala. 393. The law regards the substance rather than the form.

In another view of the case, the title of the plaintiffs to all other kinds of timber as well as timber rights and privileges must prevail. From Nov. 2nd 1900, they had an option of purchase of the land as it then was. Buskirk offered it, through Crane & Co. at $8750.00, Aug. 23rd 1900. By letter dated, Aug. 28th 1900, Woodbury accepted the offer. Under date of Nov. 2nd, Crane & Co. advised him of their authority "to close the sale" with him "at $8750.00." This constituted at least an option of which they had notice, and they purchased a part of the subject matter thereof, if the deed could be said to include the small timber, and they hold it as trustees for the plaintiffs. *Barrett* v. *McAllister,* 33 W. Va. 738.

On a third ground or basis, the plaintiffs must prevail, Crane & Co. were the agents for Woodbury in the transaction, notwithstanding they were paid no money consideration for their services. They assumed to act for him and did so, and thereby established a relation of confidence which they could not violate, nor pervert to their own profit and the detriment of their principal. Nor does it matter that they were agents of Buskirk also. There may be a double agency. *Peters* v. *Riley,* not yet reported; *Cassidy Fork Lumber Co.* v. *Terry,* 69 W. Va. 572. An agent is not permitted to hold, against his principal, the fruits of the exercise of his powers as such. *Frank* v. *Morris,* 9 W. Va. 664; *Wellford* v. *Chancellor,* 5 Gratt. 39.

It remains to consider the exception made in the deed from Buskirk to Woodbury, after the deed to Crane & Co. and in pursuance of the contract. It does not exactly follow the language of the exception in the contract, but it must be read in the light of the situation of the parties, their purposes and the surrounding circumstances. Having the equitable title to the land, subject to Crane & Co's. contract of Oct. 9th 1899, and their deed of Jany. 1900, there is a presumption against intent to except any portion thereof. None of the consideration was abated, and the meaning of the second deed to Crane & Co., read in the light of Woodbury's contract, cannot be deemed to have been disregarded or overlooked. Properly interpreted, it passed no title to any timber other than that to

which Crane & Co. had equitable title, under their original contract. Passing such title, it was a proper subject of exception, wherefore there was ground and reason for varying the terms in the exception in the deed from those used in the contract so as to include what said second deed really passed.

From these principles and conclusions, it results, that the decree complained of must be reversed, the defendant enjoined, restrained and inhibited from cutting timber, in accordance with the prayer of the bill, and the cause remanded for an accounting for the value of timber wrongfully cut.

*Reversed, and decree for plaintiffs.*