# CHARLESTON.

A. C. LAWRENCE v. JAMES POTTER et als.

Submitted April 25, 1922.   Decided May 2, 1922.

1.  EQUITY—*Delay in Prosecution of Suit to Preclude Relief Must Be Under Circumstances to Work Material Prejudice to Defendant.*

    Though lack of diligence in the prosecution of a suit in equity, after commencement thereof in due time, may amount to laches and thus preclude relief, the delay in prosecution, to have such effect, must be of such duration and under such circumstances as to work material prejudice to the defendant. (p. 365).

2.  SPECIFIC PERFORMANCE—*Prosecution of Suit for Specific Performance of Contract to Convey Oil and Gas Property to Final Decree Within Four Years Held to Show Diligence.*

    Prosecution of a suit for specific performance of a contract for conveyance, assignment or transfer of oil and gas property, to final decree, within a period of less than four years, within which voluminous depositions were taken on both sides and the rights of no third parties have intervened, manifestly complies with the requirement of diligence, even though the property has been greatly enhanced in value within such period, by the enterprise and at the cost of the defendant. (p. 365).

3.  COMPROMISE AND SETTLEMENT—*Bona Fide Claims Under Adverse Titles Giving Rise to Litigation, Constitute Sufficient Consideration for Compromise Agreement.*

    *Bona Fide* claims of right in respect of real estate, under adverse titles, giving rise to litigation between the claimants, constitute sufficient consideration for a compromise agreement between them, and neither can be absolved from the obligation thereby imposed upon him, on the ground of lack of title in the other.  (p. 368).

4.  SAME—*In Compromise Involving Adverse Title, Party Recognizing Opponent's Claim as Bona Fide Cannot Deny His Obligation for Lack of Claimant's Title.*

    If, in such compromise, the right of one of the parties to the adverse title claimed by him, depends upon the true interpretation of an ambiguous contract, and his claim is recognized by his opponent as being *bona fide* and contracted for by

91 W. Va.

him, in the agreement, he cannot be heard to deny his obligation, on the ground of lack of title in such claimant. (p. 368.)

5. MINES AND MINERALS—*Assignors Held Beneficial Owners of Leases Assigned to Corporation for Operation.*

Under an assignment to a corporation of all interest in oil and gas leases by the owners thereof, containing stipulations requiring the corporation to operate the properties and pay to the assignors the proceeds of the oil and gas found and produced, less its expenditures in such operation, and binding the assignors to reimburse it for all losses incurred after 90 days' notice so to do, the assignors are the beneficial owners of the leases. (p. 368).

6. SAME—*One Purchasing With Understanding That Title Shall Be Clear of Burden of Prior Assignment, Cannot Escape Obligation After Clearing of Title.*

One who has contracted for the purchase of the interest of one of the owners of such leases, with the understanding and agreement that the title shall be cleared of the burden of superior right thereto in a stranger, by reason of a prior assignment of the leases, cannot absolve himself from the obligation incurred by him in such purchase, after such outstanding and superior right has been acquired as contemplated, on the ground of the infirmity in the title at the date of the contract. (p. 368).

7. CONTRACTS—*One of Several Agreements Forming Integral Part of Entire Transaction Cannot Be Treated By Party as Disconnected Agreement While Claiming a Right Under Other Parts.*

One of several agreements, each of which is an integral part of an entire transaction involving transfers of a number of separate and distinct rights and interests and incurrence of new obligations by some of the parties, cannot be treated by one of the parties thereto as a disconnected agreement or a mere revocable offer, while claiming and acquiring a right belonging to the other by consummation of other parts of the entire transaction. (p. 370).

8. SAME—*Held, That Party Could Not Discharge Himself from Liability Under a Part of An Obligation and Yet Claim Rights Against Another Under it.*

Nor is such party discharged from the obligation imposed upon him by the particular agreement by a declaration of

abandonment of the entire transaction, at a time at which he could rightfully have abandoned it, if immediately afterwards he renewed negotiations with all of the interested parties except the one in respect of whom he attempted to relieve himself, and procured consummation of all of the .parts save such agreement, in such manner as to exclude it, insofar as it imposed the obligation he attempted to evade, but to include it insofar as it took from the other party thereto a right or title constituting a material inducement or consideration for such agreement.    (p. 371).

9.   TENANCY IN COMMON—*Party Buying of One Cotenant, Another's Interest in Oil and Gas Lease is Bound to Know Extent of Seller's Authority.*

A tenant in common in an oil and gas lease has no implied authority to dispose of his cotenant's interest therein, and an express authority so to do, founded upon no consideration, is revocable.   One dealing with a part owner of such a lease in respect of his cotenant's interest, is bound to know the extent of his authority; and, in relying upon such part owner's representations as to it, he acts at his peril.   (p. 372).

10.  CONTRACTS—*Limitation in Offer for Immediate Acceptance Held to Relate to Composite Transactions and Not to Integral Part.*

A limitation in an offer to consummate a transaction involving a number of contracts respecting separate and distinct rights and interests, saying it is for immediate acceptance, relates to the composite transaction, not to one of its integral parts.   (p. 373).

11.  Same—*Repeated Request for Modification, Unaccompanied By Renunciation, Held Not Ground for Renunciation By Others.*

Repeated requests by one of the parties to a contract, for modification, unaccompanied by any renunciation of it as made, even though annoying and unreasonable, constitute no ground for renunciation thereof by the other.   (p. 375).

12.  FRAUDS, STATUTE OF—*Telegram From Vendor to Purchaser and Undelivered Deeds Held Sufficient Memoranda.*

A telegram from a vendor to his vendee, admitted in evidence without objection and impliedly acknowledged in the testimony of the vendor, as having been sent by him, and undelivered deeds executed by him, fully disclosing the terms of the contract, constitute a sufficient memorandum thereof, under the statute of frauds.   (p. 376).

13.    MINES AND MINERALS—*Contract for Conveyance or Assignment of Interests in an Oil and Gas Lease May Be Modified in the Course of Negotiations, as any Other Contract.*

A contract for the sale and conveyance or assignment of interests in oil and gas leases, constituting one of the parts of a transaction involving several other matters, may be modified in the course of the negotiations, as in the case of any other contract, and the modification is deemed to have been made upon a sufficient consideration. (p. 376).

14.    SPECIFIC PERFORMANCE—*Modification of Contract Clearly Established Will Be Recognized as Part of it.*

If such modification is alleged, clearly established by proof and brought within the terms of the memorandum of the contract, it will be recognized and treated as part of the contract, in a suit for specific performance thereof. (p. 376).

(LIVELY, JUDGE, absent.)

Appeal from Circuit Court, Lincoln County.

Action by A. C. Lawrence against James Potter and others. Decree for the plaintiff, and James Potter and certain other defendants appeal.

*Modified and affirmed.*

*Mathews, Campbell & McClintic,* for appellants.
*W. E. R. Byrne* and *Blue & McCabe,* for appellee.

POFFENBARGER, PRESIDENT:

The decree complained of on this appeal requires specific performance of an alleged contract on the part of one of the appellants, to convey to the plaintiff the oil and gas and oil and gas rights conferred by two certain leases, upon the lessees therein, one of which is known as the Reece W. Pauley lease covering a 60 acre tract of land and the other, as the Caroline and W. H. Porter lease embracing a 7 acre tract of land. James Potter with whom the contract is alleged to have been made took said leases from the plaintiff and others, by a conveyance, for himself and certain associates, John E. Turner, D. G. Williamson, J. A. Williamson and D. E. Williamson, in exchange for another lease known as the Hall lease on a 40 acre tract of land and other considerations, all

by way of compromise of conflicting claims of right under leases, on the same land, executed by adverse claimants of title to the lands. By the decree, Potter and his associates above named are required to convey seven-eighths of the working interest in said tracts, to the plaintiff, within thirty days after payment by him, of $25,000.00 to the Citizens National Bank of Charleston, West Virginia, to the credit of this cause.

Although the cause of action stated in the bill arose in June or July, 1917, and plaintiff began this suit July 20, 1917, and eight days later filed his bill and obtained an injunction restraining the defendants Potter and his associates from selling, encumbering or disposing of the property in any way, until the further order of the court, which seems never to have been dissolved, the rule or principle of laches is invoked against the decree, on the ground of lack of diligence in prosecution of the suit. The decree was entered March 11, 1921, about three years and eight months after commencement of the suit. On account of their connection with the transactions giving rise to the alleged cause of action, a number of other persons were made defendants to the bill, and they filed answers to it, December 3, 1917. The separate demurrer and answer of Potter was filed, September 7, 1918. The taking of depositions by the plaintiff was commenced February 27, 1919, and completed January 3, 1921. The defendant commenced taking proof June 14, 1919, and finished June 19, 1920.

None of the many precedents invoked in support of this contention rest upon a similar state of facts. In each of them, the lapse of time was greater and it was accompanied in every instance by additional circumstances tending to prove an equity in the defendant and lack thereof in the plaintiff. The only circumstances strongly urged here are the variableness of value in mining properties and the development of the leases by Potter and his associates, pending the litigation. As the plaintiff tendered payment of the consideration by his bill, which the defendants could have accepted at any time, it is difficult to perceive any foundation for the argument that the former assumed a waiting attitude. And, as de-

fendants accepted the gauge of battle thrown down by him, within fourteen months, and relied upon their defensive propositions of law and fact, for ultimate realization of the fruits of their expenditures upon the leased land, it is apparent that they did not develop the property, in reliance upon the alleged lack of diligence in the prosecution of the suit. No claim of the kind here asserted is set up in the belated answer of Potter. He avers he paid the Eagler Oil and Gas Co. $6,250.00 for improvements on the leases and had expended an additional $29,743.77, at the date of the filing of his answer, and had received up to January 1, 1918, $8,439.56 for oil sold from them. He claims no great increase in value, if any at all, and only asks, in this connection, reimbursement for his expenditures, if required to transfer the interest in the leases, sought by the bill. By the decree complained of, the appellants are protected as to the cost of production of oil from the properties; in the accounting ordered, and the appellee acquiesces in it. Hence, the former can lose nothing beyond the gains and profits in what they claim to have been their contract and the plaintiff obtains only the gains and profits in what he claims to have been the agreement. It may have been necessary to develop in order to hold the leases, but the appellants will be reimbursed for their expenditures and paid the purchase price of $25,000.00. Their development in view of the litigation manifestly proceeded in reliance upon their certainty of gain in any event, and not upon the slight delay, if any, in prosecution of the suit. There is no ground for a presumption of abandonment of the claim by the plaintiff. Rights of no strangers to the controversy have intervened. No evidence has been lost by death of witnesses or otherwise. No element of estoppel is perceived. Invocation of the doctrine of laches, therefore, is based upon the dry letter of its statement, not its spirit or salutary purposes.

Potter and his associates were lessees of 12,900 acres of land in Lincoln County, under the Standard Fuel Company, a corporation, claiming title to the minerals therein. Lying within that territory are the Porter, Pauley, Hall and Nuckles tracts. Ownership of the minerals under said tracts was

claimed adversely to the Standard Fuel Company, and the adverse claimants executed leases thereof to other parties, and, in the rival efforts of the lessees and assignees of leases under the adverse titles, to obtain possession and drill the properties, litigation arose in both state and federal courts. An agreement of compromise was made, by which Potter took such title as his adversaries claimed in the Porter, Pauley and Nuckles properties and they such title as he had in the Hall property, by reciprocal conveyances. The plaintiff claims, as part and parcel of this transaction, an agreement between him and Potter, by which the latter bound himself to convey and assign to the former, seven-eighths of the working interest in the Pauley and Porter properties, for and in consideration of $25,000.00, and he asserts, in his pleading and testimony, that he would not have joined in the deed assigning these two leases and the Nuckles lease to Potter, but for the agreement for reconveyance to him. Potter admits the agreement, but treats it as a matter separate and distinct from the contract by which the conveyances were made to him. According to his contention, he merely offered to sell Lawrence the interest in controversy and withdrew it for failure of acceptance in proper time and manner.

Several individuals and a corporation were associated with Lawrence in his holdings. He, C. W. Eagler, J. W. Ramsey, J. A. Jarrett and W. W. Smoot acquired by assignment from one C. E. Goettman, a three-fourths working interest in leases on the Pauley and Porter properties, executed to one Frank Abercrombie and assigned by him to Goettman. The same parties were substantially owners of all of the stock of the Eagler Oil and Gas Co. By a contract dated, May 22, 1916, the Eagler Oil and Gas Co. obtained the right to operate under the leases. This contract is peculiar in its terms and provisions. It purports an assignment of the three-fourths working interest to the corporation. Then follows a stipulation of acceptance of the assignment by the corporation and assumption by it, of duty to drill the leases for oil and gas and to pay over to the assignors the proceeds of the sales of the products, one-fifth thereof to each of them, after reimbursing itself for all money necessarily expended

in drilling and operating the premises. Following this provision is one binding the assignors to make good any losses incurred in the operations, within 90 days after notice so to do. Such right, if any, as Ramsey had in the leases, under this contract, he conveyed or assigned to Lawrence by an instrument bearing date, December 17, 1917. In the meantime, Goettman, on September 8, 1916, had assigned to Lawrence the other one-fourth of the working interest in the two leases. Potter strenuously denies that Lawrence had any individual interest in the property, after the assignment to the Eagler Oil and Gas Co. One ground of this denial is alleged superiority of his title; another, prior assignment of the two leases, by Goettman, to the Omar Oil and Gas Co.

The compromise made by Potter with the adverse claimants amounts to recognition of a *bona fide* claim of title and interest in them, having enough merit to make it advisable on his part virtually to purchase it. Hence, the first ground is obviously untenable. The same element or principle enters into the second. Evidently doubting its title, he was not content to take a conveyance from the Eagler Oil and Gas Co. alone. Lawrence and his associates were required individually to join in the conveyance and they did so. Thus, the contract of May 22, 1916, was interpreted by all parties to the compromise, as not having divested the assignors therein of all their rights and titles, Manifestly, it did not. Such right as they had was taken by the corporation as a sort of agent or trustee. The assignors were its only real beneficiaries. The corporation took no really beneficial interest. It was merely to operate the property and pay the entire proceeds, less expenses, to the assignors. Legally it took the title, but took it in trust for the assignors, by express agreement. Lack of definition of the arrangement signifies nothing. Courts must take nameless contracts for what they are and define the rights of the parties thereto, as disclosed by the terms used and the purposes evinced.

Priority of the assignment to the Omar Oil and Gas Co. is admitted, but, as a part of the compromise transaction, an arrangement was made and consummated by way of extinguishment of the interest of that company. Although the

prior assignment was recorded, Lawrence claims he had no actual notice of it, until after his purchase from Goettman, of the latter's remaining one-fourth at the price of $7,500.00 and payment of one-third thereof. After actual notice thereof, he took the matter up with Goettman and the Omar Oil and Gas Co., on behalf of himself and his associates, and procured an agreement by which the remaining $5,000.00 of purchase money of the one-fourth interest should be paid to the Omar Oil and Gas Co., instead of Goettman, and all right, title and interest of the Omar Oil and Gas Co. conveyed to J. D. Kittinger, Trustee. The negotiations with that company and with Potter seem to have been contemporaneous and to have been conducted by Lawrence. When they were commenced is not disclosed. The assignment to Kittinger is dated April 30, 1917, but was first delivered to the Citizens National Bank, in escrow, to await payment of the $5,000.00. At about the same time, Potter agreed to the basis of compromise. Thereafter, all of the constituent parts of the compromise progressed contemporaneously. Consummation thereof was delayed by necessity of assent to it by the adverse lessors, on an agreed basis of division of the royalties in some manner. The deed to Potter and his associates, conveying the Pauley, Porter and Nuckles leases, and the deed from them to the Eagler Oil and Gas Co., conveying the Hall lease, were executed and delivered to the Kanawha Banking and Trust Co., in escrow, under a written agreement signed by all of the interested parties, except Kittinger, Trustee, and the Omar Oil and Gas Co. Neither this assignment to Kittinger nor the deeds held under the agreement were delivered until later. The assignment was delivered to Kittinger, on payment of the $5,000.00, by the Eagler Oil and Gas Co., on June 11, 1917, and the deeds were delivered two days later. In the meantime, a controversy seems to have arisen about the time of the delivery of the assignment, between Lawrence and his associates, the latter having apparently imputed to the former purpose and intent to acquire the Omar Oil and Gas Co.'s superior title for himself and in extinguishment of their right. He denies any such purpose and insists that his negotiation of the purchase of that

interest was for the common benefit of himself and his associates. In this, he is corroborated by Kittinger, who says he was informed that he was to hold it for all of them. It does not appear that Lawrence ever claimed it otherwise than on behalf of all, and this recital of facts makes it obvious that it was taken as a necessary element in effectuation of the compromise. Without it, good title could not be made to Potter, for the Pauley and Porter leases. A telegram from Potter to Lawrence, dated May 1, 1917, advises the latter to hold Clark, representative of the Omar Oil and Gas Co., in Charleston, until the former could arrive there, if it was necessary to do so in order to consummate the compromise proposition accepted by the same telegram. It is obvious, from this recital of facts that the Omar Oil and Gas Co. right now held by Kittinger, Trustee, does not necessarily preclude right and title in Lawrence. That company is no longer interested, and its former title is held by the trustee for Potter, subject to such right as Lawrence may have against him, the Eagler Oil and Gas Co. and Lawrence's other associates in the original holdings or claims, who have joined Potter in resistance thereof. Their mere suspicion, if any, of infidelity on the part of their associate does not supply proof of it.

Notwithstanding the controversy as to the titles under which the parties claimed, the contract with the Eagler Oil and Gas Co. and the acquired superior right of the Omar Oil and Gas Co., Lawrence had ample ground for a *bona fide* individual claim of right in the two leases in question, at the date of the alleged consummation of the compromise, which is relied upon as having extinguished that claim, without compliance on Potter's part with the alleged reciprocal obligation in Lawrence's favor, amply sufficient to constitute an equity upon which he stood in his demand for compliance by Potter, with the alleged side agreement, at the date of the transaction and consistently and constantly asserted ever since.

That claim and equity taken in connection with the other facts and circumstances and uncontradicted testimony found in the record, conclusively demonstrate the unsoundness of the contention that the agreement here involved was an in-

dependent one, or a mere offer of sale, subject to withdrawal before consummation of the other agreements with which it was clearly connected. The real transaction was a composite one made up of several elements and subsidiary agreements. Potter could properly accept it only in its entirety, and he could not reject any part, while holding on to another to the detriment of the party as to whom he desired to reject. No party to the arrangement could withdraw or eliminate any part of it, to the prejudice of another and still bind him, against his will. And, even though titles have passed in partial execution, against the will and over the protests of injured parties, the wrongs done are subject to correction. All who entered into the composite arrangement, made their parts of it conditional upon compliance with such other parts as affected their respective interests. This interpretation of the plan for full and complete adjustment does not imply or mean that each party had a proprietary interest in all of its elements. For instance, the Omar Oil and Gas Co. had no such interest in the subject matter of any conveyance other than the one it made, but it was interested in getting its money and that could come in the manner contemplated, only by execution of the other agreements. Likewise, it was not essential that Lawrence's associates should have any interest in his alleged side agreement with Potter. But nothing could be done without a conveyance of the Lawrence interest in the leases. All of the agreements were so interdependent and interlaced, as to make one composite transaction. Perhaps it would not be technically correct to say the arrangement amounted to one agreement composed of many others, but it can be asserted consistently with law, that there was one all-embracing plan, arrangement or transaction incapable of complete and valid consummation, without performance of all of the agreements and compliance with all of the conditions imposed, both express and implied. *Roush* v. *Miller*, 39 W. Va. 638; *Pardee* v. *Crane & Co.*, 74 W. Va. 359, 370; *Gillian* v. *Moore*, 4 Leigh 30; *White* v. *Brockaw*, 14 O. St. 339; *Coffman* v. *Coffman*, 79 Va. 504.

Potter does not deny the agreement. He denies the character and effect claimed for it by Lawrence. His telegram

of May 1, 1917, referred to that agreement and connected it
up with the others, as contemplated. In it, he said: "I am
still willing to settle on basis last talked of, that is all of
Nuckles, one-eighth Pauley and Porter, all other Eagler ter-
ritory inside James line except Hall Twenty-five Thousand
cash will be in Charleston Thursday morning if you find it
necessary hold Clark until then. This offer for immediate
acceptance only." The reference to $25,000.00 necessarily
goes to the offer of Lawrence to buy the interest he seeks by
this bill. This is not denied and it could not be applicable,
under the evidence, to anything else. The telegram states
what he was to get, the Nuckles lease, one-eighth of the Pauley
and Porter, all other territory inside of the James line,
except the Hall lease, and $25,000.00. These terms are in
exact harmony with the ultimate results contemplated by the
admitted plan, and they were susceptible of achievement by
the conveyances made and the one promised by Potter, but
omitted and refused by him. Seeing no reference to this
part of the scheme in the escrow agreement under which
deeds were deposited, Lawrence refused to execute it, until
after he had been assured that the promise would be redeemed,
by Potter's acquiescence in the agreement as stated by him,
in the presence of a witness expressly called to hear it. He
about the same time caused a deed to be prepared, conveying
seven-eighths of the Pauley lease to Lawrence, in considera-
tion of $10.00 cash and ........ dollars to be secured by
a deed of trust, which deed he and his associates signed and
acknowledged. Nearly a month later, they executed 'an-
other covering their entire interest in both leases at the price
of $25,000.00 in cash, but inserted nobody's name as grantee.
Potter's claim of an independent and revocable offer of sale
is thus overwhelmingly refuted and condemned by proof.

Nor can it be said the condition of immediate acceptance
imposed by the telegram of May 1, 1917, related only to the
purchase of the interest in the two leases. Potter had to
obtain that interest before he could convey it and get the
money for it. His money could come only contemporaneously
with consummation of the other transactions or afterwards.
An acceptance, if made then, would necessarily have been

conditional. What he meant was that the entire scheme or plan must be accepted and it was. They all began the work of execution at once and continued until it was completed except as to Potter's omitted conveyance and payment of the money. The contention that he was released by Lawrence's requests for modification is equally devoid of merit. Lawrence claimed to have encountered difficulty in raising money to pay the $25,000.00 and develop the property. In order to make it easier to do so, he requested conveyance of the entire working interest in the two leases and Potter conceded it. Then he asked for inclusion of the Nuckles lease, which was refused. Then Potter attempted to eliminate this agreement entirely from the transaction. He says he declared it off, but this all occurred June 8th and before any papers had been finally delivered. Lawrence never acquiesced in this attempt to eliminate it. He continued to demand the conveyance and raised the money. He let the assignment of the Omar Oil and Gas Co. go into the hands of Kittinger, but that was not beyond recall. It is still there. Before the deeds were delivered by the Kanawha Banking & Trust Co., Lawrence demanded of Potter the conveyance he had agreed to make. This occurred June 12, 1917, when Potter and the Eagler Oil & Gas Co. and their representatives and attorneys were preparing to have the deeds delivered and delivery thereof occurred the next morning. The only answer made to his demand was that he had no contract. All of the parties, except Lawrence, were satisfied, but he undoubtedly was not and they knew it. They defied him and went on.

In connection with the attempted repudiation by Potter, on June 8, 1917, the date on which Lawrence requested inclusion of the Nuckles lease, a transaction had in the afternoon of that day is relied upon as an estoppel. Lawrence was not present, but it is claimed, he was represented by the attorney for the Eagler Oil and Gas Co. He was a stockholder in that company and active in its affairs, but, as has been shown, he had an individual interest he was looking after himself and there is no clear proof that the attorney named represented him as to that. All the attorney says on the subject is that he represented the Eagler Oil and Gas Co.

and the stockholders of that company, including Lawrence. At that meeting and before, it was represented by Eagler that Lawrence had relinquished the part of the transaction in which he was individually interested, and then it was agreed among them that Potter should pay an additional sum of $5,500.00 for improvements, making the amount $6,250.00, instead of $750.00, and the escrow agreement was continued. Neither Eagler nor Jarrett swears Lawrence, on that day, after Potter had said the deal was all off, told him they could eliminate his agreement. On the contrary, Eagler admits Lawrence told him he still thought he could put it through. But their principal reliance is upon a claim that Lawrence had previously said that he would stand aside and let them consummate the deal upon terms satisfactory to themselves, if he failed in his efforts to consummate it as they then knew it had been originally contemplated. They argue that he had failed, because Potter about noon of that day, had declared the incident closed, and the escrow agreement expired at noon of that day. If Lawrence made any such previous agreement with his associates, he could retract it, for it rested upon no consideration. Although the escrow agreement expired at noon of that day, it was revived when Potter availed himself of it, by failure to take down his own deed and authorize the return of the other and then claimed the benefit of such other. He could not play fast and loose in the matter. As to Lawrence's interest, he was bound to give as well as take or abstain from taking. Within four days after that alleged modification and before any money was paid or deeds delivered or any changes made in any of the deeds, Lawrence appeared on the scene again in person and impliedly demanded the deed promised him, by forbidding consummation without the conveyance to him of the "Pauley and Porter tracts upon the consideration of the payment of twenty-five thousand dollars and the one-eighth interest as agreed." In the written notices that day served, he charged Eagler and Jarrett with an attempted perpetration of a fraud upon him in the transaction. He may not then have known what they had said, for it does not appear that he was informed. The contents of the notices were mani-

festly sufficient to apprise Potter of their lack of right to represent Lawrence in respect of his individual interests. On the next day, while Potter and his attorneys were in consultation with Jarrett, Eagler, Smoot and Kittinger, about the time of the delivery of the deeds, and in the midst of an effort to obtain an assignment from Kittinger of the Omar Oil and Gas Co. interest to Potter directly or indirectly, Lawrence again came in and successfully resisted the assignment and again demanded performance by Potter, offering to pay the $25,000.00, but Potter declined to deal with him in the matter at all. On June 18, 1917, the last day to which the escrow agreement was extended, Lawrence notified Potter by wire that he was ready, willing and able to pay $25,000.00 for the entire working interest in the Pauley and Porter leases, on delivery of good title, offered to do so and urged Potter to accept. To this offer there was no response.

In view of this persistent effort on the part of Lawrence, to obtain the benefit of the admitted agreement, after further modification was refused and before the transaction was closed or anybody had materially changed his position, it is impossible to reach the conclusion that Potter was justified in refusing performance. Lawrence never repudiated his agreement. There is no proof that his requests for modification were accompanied by notice of purpose not to perform in the event of refusal of the requests. Lawrence was holding fast what he had and seeking more. Potter could refuse the requests and also performance of any part of the contract, after expiration of the escrow agreement, in the absence of renewal or extension thereof; but he could not seize upon mere annoyance occasioned by the requests, for partial rejection thereof without the consent of Lawrence, in so far as he was to be affected by it. Both knew the arrangement could not be completed on June 8, 1917. The occasion of the extension of time was lack of notice of an agreement among the lessors. Lawrence's delay in his return to the original terms of his agreement wrought no prejudice to Potter. The new arrangement he made with the Eagler Oil and Gas Co., in the afternoon of the day of the attempted repudiation, could well have been postponed. There was no necessity for

an instantaneous reformation to the detriment of Lawrence. The haste is suggestive of improper motive. However that may be, Potter could not rightfully take Lawrence's property into the new deal, without his consent, nor could his associates, Eagler and Jarrett, put it into such a deal, against his will.

Although the statute of frauds is relied upon by way of defense, in the answer, it is not invoked in the brief and was barely mentioned in the oral argument. The telegram of May 1, 1917, constitutes a fairly good memorandum of the agreement, as the decree enforces it. That instrument was admitted in evidence without objection, and its genuineness and authenticity are clearly indicated by Potter's admissions. It is also supplemented and extended to his associates by the undelivered deeds signed and acknowledged by them. All of these papers taken and read together, as they undoubtedly may be, constitute an amply sufficient memorandum of the contract, signed by the parties charged. 20 Cyc. 254-5, citing numerous decisions fully sustaining the text. Although undelivered, the deeds are admissible as memoranda. *Moore v. Ward,* 71 W. Va. 393.

The decree, as has been observed, does not give the appellee all he claims. He asserts right to the entire working interest granted in the two tracts of land, but was awarded only seven-eighths thereof. Upon the modification verbally admitted by Potter in his testimony and evidenced by the signed and acknowledged, but undelivered, deed of May 31, 1917, he cross-assigns error against him in the decree, to the extent of the denial of the one-eighth which the appellants were allowed to retain. The court below seems to have regarded the telegram of May 1, 1917, as alone constituting the memorandum of the contract. It supplies certain factors omitted in the deeds and each deed supplies an element omitted in the other, the name of the grantee in one and the consideration in the other. The telegram called for cash and conveyance of seven-eighths. The deed of May 4th conformed to the telegram, as to the interest to be conveyed, but changed the terms so as to defer payment. The deed of May 31st provided for conveyance of the entire interest and payment of cash. It was executed pending the negotiations and before delivery of the deeds de-

posited in escrow. All parties were anxious to effectuate the compromise. Lawrence represented that he could not handle his part of it on the seven-eighths basis. Potter, being convinced of his inability so to do, yielded the other eighth, but required cash. This modification was made in the second deed. The admitted facts put the modification beyond doubt. No reason is perceived why it should not be allowed effect. No money was paid for it, but it was made an integral part of the transaction, before extension of the escrow agreement and before final delivery of the deeds under that agreement. Lawrence has never relinquished it. In point of consideration, it has the same kind of a basis or inducement as the other provisions. It differs only in time, but no materiality is perceived in that. The informality and raggedness of this agreement are due to omission thereof from the agreement under which the deeds were put in escrow. Lawrence was entitled to have it provided for in that agreement along with the others. That not having been done, he could rely upon other memoranda of his contract, and it could be modified as any other contract may be.

Upon these principles and conclusions, the decree complained of will be so modified as to require the appellants to convey to the appellee the entire working interest in the said two leases, and, as so modified, it will be affirmed.

*Modified and affirmed.*