HADDAD v. WESTERN CONTRACTING CORPORATION et al. (NATIONAL SURETY CORPORATION, defendants to counterclaims).

Civ. No. 106-F.

District Court, N. D. West Virginia.

Dec. 23, 1946.

Stathers, Stathers & Cantrall and William G. Stathers, all of Clarksburg, W. Va., and Howell Lenck, of Cleveland, Ohio, for plaintiff.

Steptoe & Johnson, James M. Guiher, Edward W. Eardley and Donald R. Wilson, all of Clarksburg, W. Va., for defendants and counterclaiming plaintiff.

Brown, Jackson & Knight and Thomas B. Jackson, all of Charleston, W. Va., and N. W. McConnell, of New York City, for defendant to counterclaim.

HARRY E. WATKINS, District Judge.

This is an action brought by Said S. Haddad, a subcontractor, against Myers-Western, the principal contractor, for $48,919.89 for breach of contract in the construction of the Parkersburg, W.Va. airport. The defendant denied liability and filed a counterclaim against plaintiff and National Surety

Corporation, the surety upon plaintiff's performance and payment bonds for total damages of $130,986.18. National Surety denied any liability upon either the performance or payment bond for breach of contract by its principal, the plaintiff herein. It sets out two other defenses, upon which it bases separate motions for judgment on the pleadings, and for summary judgment, as follows: (1) It says that on November 15, 1944, its principal, Haddad, and Myers-Western entered into a written contract which materially altered and modified the subcontract, without its knowledge or consent, and to its prejudice. (2) It says that all claims of Haddad against Myers-Western and all claims of Myers-Western against Haddad were compromised and settled in April, 1945 after prolonged negotiations between the parties, in which it participated, and in which Myers-Western agreed to pay a stipulated amount to Haddad, and it also promised to pay the sum of $2,000 for the use and benefit of Haddad.

Before trying the controversy between Haddad and Myers-Western as to which party first violated the subcontract for grading and drainage, all parties asked the court to first try the two separate defenses of the surety company and to determine whether the surety company should be dismissed out of the case. Thereupon, Myers-Western and the surety company were granted a separate trial upon the two defenses mentioned above. Both sides waived a jury and submitted all questions of law and fact to the court for decision.

By written agreement dated September 19, 1944, Myers-Western, prime contractor under a contract with the United States Government, subcontracted to Said S. Haddad all of the drainage work in connection with the construction of the Wood County airport near Parkersburg, West Virginia. For the subcontract work, Haddad was to be paid by Myers-Western the latter's aggregate bid to the Government on unit prices for the drainage work, less 6% allowance to the prime contractor, making a net price to Haddad of $151,250.70. In accordance with the terms of the subcontract, on September 21, 1944, Haddad executed and delivered to Myers-Western two bonds, on both of which National Surety Corporation was surety: A performance bond of $151,250.70, guaranteeing performance by Haddad of his subcontract; and a payment bond of $75,625.35, guaranteeing payment of Haddad's labor and material bills on the project.

### First Defense.

The performance bond contained the following condition: "If the principal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract, during the original term of said contract, and any extensions thereof that may be granted by the obligee, with or without notice to the surety * * * and shall also well and truly perform all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived, then this obligation to be void; otherwise, to remain in full force and virtue."

The payment bond, on which Haddad was principal and National Surety was surety, contained a similar condition.

Shortly after he commenced work on the subcontract, Haddad began to complain that Myers-Western was not affording him sufficient places where he could perform the drainage work, which charge Myers-Western denied. Negotiations between the parties resulted in a settlement, the terms of which are reflected in a letter written to Myers-Western by Haddad under date of November 15, 1944, stating, in part, as follows:

"It is now agreed that we will shut down operations until such time as you notify me that your cuts and fills have been completed to an extent that we will be afforded a place to work. We now anticipate that you will accomplish this work by the middle or latter part of December and that we will probably be called upon to resume work in late December or early January. You are to extend the contract time to April 1, 1945, or not later than the completion date of your prime contract.

"I will arrange to pay all outstanding bills during this shut-down period based up-

on obtaining an advance of $3,000 from you in addition to estimates now earned and payable. It is my estimate at this time that my contract can and will be completed without loss. However, I agree that in the event of any loss on said contract, that the $3,000 which you now advance will be the maximum claim of any kind which I may make against you by reason of your inability to afford a place to work."

National Surety's Parkersburg agent, who wrote the bonds, was notified by Haddad of this settlement around December 1, 1944, and the surety's home office was advised of it by said agent some time in January, 1945. On March 22 and 23, 1945, Haddad and his attorney went to the Home Office of National Surety at New York City, at which time the Home Office representatives were fully informed of the November, 1944 settlement, and a copy of the November 15, 1944 letter was exhibited to and examined by them. National Surety attached no particular significance to the settlement at that time, and never asserted or claimed to Myers-Western, or any one else, that the settlement effected a discharge of the surety from its bonds until its answer was filed in the present case in January, 1946.

National Surety did not merely remain silent on the subject of its alleged discharge from the bonds by the November, 1944 settlement between its principal and Myers-Western. After having full knowledge and notice of this settlement, the surety, by affirmative conduct and statements, recognized that its bonds were still in force and effect.

National Surety adduced no definite or satisfactory proof that it was ever materially prejudiced by the November, 1944 agreement between its principal and the obligee of the bonds. The conduct of the surety throughout indicated that no material or substantial prejudice resulted to it.

 It is my opinion that the agreement of November 15 was more than a routine controversy. In releasing Myers-Western from future liability because of failure to furnish a place to work, it materially changed the contract without the knowledge of the surety. But since there were no future damages because of failure to furnish a

place to work, the surety was not prejudiced. Furthermore, the evidence shows that the surety waived the alteration after learning of it. An alteration or modification of a construction contract without the surety's knowledge or consent will not discharge a compensated surety in the absence of material prejudice to the surety. State v. R. M. Hudson Paving Company, 91 W.Va. 387, 113 S.E. 251.

### Second Defense.

Haddad resumed work about January 28, 1945, and thereafter numerous disputes arose between him and Myers-Western. On March 13, he informed Myers-Western that he was unable to proceed with the work then being required of him because such work was not covered by his contract. He discontinued work on March 15. Haddad then employed William Bruce Hoff and H. O. Hiteshew, attorneys of Parkersburg, W. Va., to represent him, and Myers-Western employed Herbert Boreman, an attorney of the same city to represent it. On March 27 a conference of several hours duration was held at Hoff's office, attended by representatives of the parties, for the purpose of trying to compromise all difficulties. At this conference Haddad made an offer of compromise which was taken under advisement. This offer was rejected the following day, the method of rejection used by Myers-Western being a verbal notice to that effect, given by Boreman to Hoff. At the same time Myers-Western demanded that National Surety proceed to complete Haddad's subcontract not later than May 12, and that Myers-Western would take over the subcontract if Haddad did not proceed with his work by April 2. The method chosen by Myers-Western in giving this notice was by having their attorney, Boreman, who was then representing them in this controversy, write a letter to the surety company.

Compromise negotiations were resumed on April 3 with a conference in Hiteshew's office, between the same parties at which Haddad reduced the amount he would accept in compromise settlement. No agreement was reached, but plans were made for further negotiations at a conference to be attended by a representative of National Surety. On April 4 such conference was held,

attended by Charles G. Roth, representing the National Surety, Haddad, Cunningham, his engineer, and Hoff and Hiteshew, his attorneys, and for Myers-Western there were Boreman, Foster Myers of the partnership known as Ralph C. Myers Construction Company and General Superintendent of Myers-Western on the airport, P. J. Boyles of Western Contracting Corporation, Clyde Goen, a partner in the Myers Company, and C. A. Guhne, office manager of Myers-Western on the job; R. B. Kennedy of the Pittsburgh Claims Division of National Surety, and W. J. Horne and William Muirhead, engineers for National Surety. The entire controversy was reviewed, and Haddad's last offer at the conference of April 3 was rejected by Myers-Western representatives, who made three alternate counter proposals as follows:

"1. Haddad and National Surety would complete the work called for by the subcontract and Myers-Western would give Haddad the benefit of what work it had done on the subcontract between April 2 when Myers-Western commenced work on the Haddad job, and April 4, such work consisting of several hundred feet of trenching; or

"2. Myers-Western would complete the work and make an adjustment with Haddad on the basis of the cost of completion and the subcontract price; or

"3. Myers-Western would pay Haddad $4,000 in addition to the amount of his earned and unpaid estimates, and the cost price to Haddad of certain materials owned by him still remaining on the job, the subcontract work to be completed by Myers-Western, and Haddad and National Surety would be released from all liability under the performance bond, the payment bond to remain in effect as to expenses or bills theretofore incurred by Haddad."

Haddad rejected these counter proposals, whereupon Boreman suggested that National Surety should contribute something to Haddad which, added to the amount offered by Myers-Western, might be acceptable to Haddad. National Surety refused to make such contribution. Between that date and April 19, National Surety offered to pay Haddad the sum of $2,000 if Haddad would accept the best settlement that he could procure from Myers-Western. On April 11 a conference was held in Boreman's office attended by Boswell, Boyle and Gebbard, all representing Myers-Western, at which Boswell told Boreman that he was authorized to increase Myers-Western's third alternate offer from $4,000 to $5,000. Goen, a partner of the Myers Company, was in Parkersburg at the time and approved the increase. Pursuant to this authority, Boreman notified attorneys for Haddad that Myers-Western would increase its payment from $4,000 to $5,000 under its third alternate proposal, and settle on that basis. Boreman made it clear that the offer had to be accepted promptly or it would be withdrawn. Much expense was accumulating daily on the job. After securing prompt approval of Haddad and National Surety, the latter agreeing to contribute an additional $2,000, Hoff and Hiteshew, in behalf of Haddad, on April 19 notified Boreman that Haddad unconditionally accepted the Myers-Western offer of compromise, and on the same day notified National Surety and Haddad that the controversy was settled, and requested advice as to what papers National Surety desired executed. The only respect in which the third alternate proposal as made by Myers-Western on April 4 varied from the final offer of Myers-Western, which was accepted on April 19 was that the payment of $4,000 was increased to $5,000. The subject of a written agreement was not brought up by the attorneys until after the unconditional acceptance by Haddad of the Myers-Western offer. It was then that Boreman and Hoff discussed the matter of what papers would be drawn up to evidence the agreement reached between them. All three attorneys testified that it was their desire, understanding and intention to create a binding and enforceable contract upon the verbal unconditional acceptance of the Myers-Western verbal offer; that they had authority to obligate their respective principals in this matter and did so. The attorneys agreed that it would be advisable to reduce the existing contract to writing and Boreman made such a draft and submitted it to Hoff for approval, solely for the purpose of making a memorandum or record of the details of the existing parole compromise agreement.

A conference was held in Hiteshew's office on April 23, attended by Boreman for Myers-Western, Hoff and Hiteshew for Haddad, and Roth for National Surety, at which time Boreman was informed that National Surety had agreed to pay Haddad $2,000 as an inducement for him to accept the third alternate proposal, made to him by Myers-Western on April 4, as later modified by raising the offer of $4,000 to $5,000. Boreman stated that he was not concerned with this payment and saw no reason to include it in the written agreement setting out the terms of the settlement agreement theretofore "orally agreed upon between Myers-Western and Haddad". Thereafter Boreman reduced the parole compromise agreement of April 19 to writing and on April 28 it was signed by Haddad and Hiteshew and delivered to Boreman to send to Myers-Western for execution, with the understanding that when signed by the latter it would be returned to Parkersburg to be sent to New York for execution of National Surety. Myers-Western and National Surety were both interested in seeing that the money paid to Haddad would be used, so far as necessary, to pay any of his outstanding creditors. Incidental to the oral agreement, Boreman inserted a provision in the written agreement of April 28 whereby the money was to be paid to Hiteshew as trustee for Haddad, and disbursed by Hiteshew in payment of any Haddad claims. When Hiteshew signed and delivered the April 28 agreement to Boreman, they agreed, in order to expedite payment of the claims, that Hiteshew should proceed to carry out this part of the settlement agreement without waiting for complete execution of the writing. Hiteshew immediately proceeded to have claims filed with him.

Prior to the time that the oral compromise offer was accepted on April 19, Haddad had his own engineer on the job to check up on the work being done by Myers-Western. On April 21 Hiteshew told Haddad that the case was settled and advised Haddad to take his engineer off the job, and this was done. Likewise the surety company did not put an engineer on the job, thinking the controversy was settled. Roth, a witness for the surety, testified that if it had known that there was to be no settlement it would have had its engineers on the job.

Pursuant to that provision of the third alternate proposal which provided for the sale by Haddad of certain materials on the job at cost price, Boreman inserted in the fifth item of the written agreement of April 28 that the "estimated" cost to Haddad of such materials, was "approximately" $2,389.06 and it further provided that a complete inventory of such materials should be taken, and that Haddad should pay to Myers-Western approximately $100 for dynamite and cable furnished to him by Myers-Western. Between April 28 and May 7, pursuant to the fifth item of the April 28 agreement, an inventory of these materials was taken, and at Boreman's suggestion, a supplemental written agreement dated May 8, 1945, was prepared. Boyle and Gebbard, both of Western, say that the inventory was taken by Boyle and Cunningham, Haddad's engineer, about April 7 or 8. Haddad says it was taken later and points out that the fifth item of the April 28 agreement provided for a complete inventory to be taken "with all reasonable dispatch" by a representative of Myers-Western and Haddad. This May 8 agreement, suggested by Myers-Western through its representative, Boreman, contained no new provisions amounting to a change in or departure from the earlier oral agreement of April 19, which was reduced to writing and embodied in the written agreement of April 28. It merely gave the actual cost of materials rather than the estimated cost. It was approved by counsel for Haddad, but he did not sign it because he was in Cleveland, the understanding being that he would sign later, it being the desire of all parties to expedite the matter. Boreman transmitted the supplemental agreement of May 8 to Myers-Western for execution by it with the request that it be returned to Parkersburg on or before May 12. Boreman, the sole representative of Myers-Western in Parkersburg in these latter negotiations, says that he talked frequently with his client on the telephone and kept them fully advised as to what he was doing for them. This is borne out by the fact that the May 8 agreement was specifically requested by Myers-Western in a letter to

Boreman, dated May 2 and signed by Boswell. A part of that letter says: "Will you please prepare Supplemental Agreement fixing the price of materials in total for which we are to pay Haddad. This to cover only the materials which he has paid for and separately recited in said Supplemental Agreement, materials which he has not paid for and for which we are to pay Haddad and/or the supplier."

The April 28 and May 8 agreements were not returned, and Hoff requested Boreman to wire Myers-Western and ascertain what was the cause of the delay in returning the agreements. Boreman did so wire on May 18. On May 19, Western Contracting Corporation, by P. J. Boyle, wired Boreman as follows: "Cannot understand signed papers not received by you. Have letter from Myers stating they were mailed to your office May 15th. If not received Monday wire and we will contact Myers office."

Upon receipt thereof, this telegram was read to both Hoff and Hiteshew. Boreman also furnished a copy of the telegram to Hiteshew who in turn furnished Hoff with a copy.

On May 21, Hoff called Boreman, inquiring whether the signed papers had been received by him in accordance with telegram of May 19, and was advised that the papers had not been received. Boreman told Hoff that he had wired Western advising that the papers had not been received. On June 1 Boreman advised Hoff that he had received a wire from Boswell, advising him, Boreman, that Boswell was writing him a letter about the Haddad matter. Later Boreman advised Hoff that he had received no letter from Boswell, and Boreman heard nothing further about the papers until on June 21. On June 21 Boreman advised Hoff that he had learned from a telephone conversation with Boswell that the papers would not be returned and that the compromise settlement already agreed upon would not be consummated because of some disagreement between Western and Myers. Boreman told Hoff that this was the first intimation he had from any source that the compromise settlement was not to be consummated or that there was any disagreement between Western and Myers. Boreman testified that "it was my understand-

ing that as soon as we had reached the oral agreement that both parties were free to act pursuant to that agreement; that it was not necessary to make a formal writing in order to carry the contract into effect, but only to have it for purpose of refreshing recollection as to the details of the contract, so that each party would know exactly what they were doing at all times by having it in writing"; that with this in mind he suggested to Myers-Western at the conference on April 11 that it would be well to set forth the details of such settlement in writing so that there could be no question at a later time as to the terms of the compromise agreement; that he believed his client sufficiently understood that its offer would become a binding contract upon oral acceptance by Haddad; that the prior negotiations and oral settlement of April 19 were conducted by him "with constant consultation and advice of my principals—my clients"; that he was given to understand that Boswell was the man who spoke for Myers-Western and to put the final "okay" on all matters, and that he kept Boswell advised as to "every happening with reference to this settlement which I thought we ultimately reached". Because of the Myers-Western refusal to go through with the settlement contract which he had made for them, Boreman immediately withdrew as counsel for Myers-Western.

On July 2 Hoff requested Boreman to write Myers-Western demanding return of the original and copies of the agreement of April 28 bearing Haddad's signature. Boreman wrote such letter but was never advised as to the whereabouts of such papers. The papers, signed by Haddad and Hiteshew, were never returned.

The compromise offer made by Myers-Western, which was finally accepted on April 19 is the same as the compromise agreement reduced to writing by written agreements of April 28 and May 8. The third alternate proposal made by Myers-Western provided that in addition to the $5,000 it would pay Haddad his earned and unpaid estimates. Of course, any advancements or credits to which it was entitled would be deducted. His estimates for the month of March had not been paid. It was also to pay Haddad the cost price to

him of the materials still remaining on the job. Using this as a formula, and after the oral agreement had been completed, it was thought advisable for the parties to proceed with the mechanics of carrying out the settlement by making the calculations and inserting the actual figures into some sort of a memorandum or writing to record the actual figures. This was the purpose of the April 28 agreement. It provided that Myers-Western pay Haddad $9,802.15, which was the $5,000 payment plus $4,802.15 due for earned and unpaid estimates. The April 28 agreement also provided that the "estimated cost" to Haddad of the materials on hand was $2,389.06. It provided that "a complete inventory of said materials will be taken with all reasonable dispatch by a representative of each of said parties * * *". The object of the agreement of May 8 was to reduce the cost price of such materials to an absolute certainty. The figure inserted was $2,389.06 the same as the estimated cost inserted in the April 28 agreement. The unpaid earned estimates and the cost to Haddad of the materials on hand were definite and ascertainable. The two written agreements were nothing more than mechanics to effectuate the oral agreement of April 19. They were both drawn by the Myers-Western attorney and the figures inserted were, in each instance, as Myers-Western interpreted its oral agreement. For example, Myers-Western asked that the $3,000 payment of November 15 and the six per cent commission due it under the subcontract be deducted in figuring the amount due Haddad on earned and unpaid estimates, and such was approved by Haddad. The amount which Myers-Western was to pay turned out to be considerably less than what Myers-Western supposed it to be at the time of the oral agreement on April 19.

What happened to these written agreements and the reasons assigned for their retention is very interesting and revealing. Boyle, who assumed charge of negotiations for Myers-Western in the absence of Boswell, admitted that the April 28 agreement embodied "What our understanding of the thing was" and that "it was acceptable to us" and that "it was not objected to when we got it", and admitted that

the supplemental agreement of May 8 was entirely satisfactory. In fact, Boswell signed the three copies of the April 28 agreement for Myers-Western, the partnership, and sent them on to Myers by letter dated May 10, stating that he would like to meet Goen in Parkersburg to see what they could do toward "getting the drainage in the money". (It appeared that the drainage might be in the red). Boswell also signed the May 8 agreement for Myers-Western, the partnership. Another draft of that agreement prepared by Judge Kindig of Sioux City, Iowa, counsel for Western, was enclosed with instructions to Goen to sign it instead of Boreman's draft of May 8. Boswell also signed it for Myers-Western, the partnership. The essential difference in the two was that the Kindig supplemental agreement expressly provided for a release of all claims against Myers-Western. This was no alteration, because the final settlement of all claims between the parties would have had the same effect. Besides, the April 28 agreement expressly provided for the mutual release of all parties.

These papers were received by Goen, who was a son-in-law of Ralph Myers, and a partner in the Ralph Myers Construction Company. Goen had arrived in Parkersburg the latter part of March and took a leading part in the negotiations. He was present on April 4 when Myers-Western offered its third alternate proposal to Haddad for settlement. He was in Parkersburg and had approved the increase in that offer on May 11. On May 15 he wrote Boswell and acknowledged "receipt of your agreement with Haddad" and advised "that we are signing same and mailing to Mr. H. C. Boreman at Parkersburg, W. Va." It was upon receipt of this letter that Boyle wired Boreman on May 19, in effect, that the agreement had been signed and mailed, which message was communicated to Hoff and Hiteshew. He says that he wrote this letter before reading the agreements; that the next day he talked with his father-in-law, Ralph Myers, and they both decided not to sign them because they released the National Surety from its performance bond. Goen testified that outside of releasing the surety he had no other

objection to the agreements. This is in face of the admitted fact that the third alternate proposal of settlement, offered by Myers-Western at the conference of April 4, in Goen's presence, expressly provided for the release of National Surety from all liability under the performance bond. Goen's father-in-law suggested to him that since he was going to Parkersburg to meet Boswell that he take the agreements with him. As suggested, he took all the papers with him to Parkersburg to meet Boswell. Boswell was ill and Hubert Everist, president of Western, came to Parkersburg in his place and met Goen there about May 23. Goen testified that when he met Everist in Parkersburg they "went out on the job and looked the work over, and went back to the office, checked up on the figures of how the drainage work was coming out in dollars and cents" and "found, out, according to our records in the office, that the drainage work was in the red $25,000 to $30,000". Goen testified that after they had gone over the job and seen what their experience had been with it up to that time that he and Everist decided they would not sign the contract. Upon cross-examination he stated that he and his father-in-law had decided before he went to Parkersburg that he was not going to sign the papers and insisted that what conditions he found at Parkersburg did not determine his decision.

At the pre-trial conference, Myers-Western was asked to produce the agreement of April 28, and agreed to produce the same at the trial. On direct examination Goen testified as follows: "Q. What became of the original papers that you had taken over there with you when you met Mr. Everist? A. I gave them back to Mr. Everist. I presume he took them back to Sioux City."

Nevertheless, upon cross-examination Goen admitted that he still had in his possession one of the original copies of the April 28 agreement, which he then produced at the request of the court, and which, after considerable questioning, he stated was the copy which he received from Boswell in the letter of May 10, and retained by him. When opposing counsel examined this copy of the April 28 agreement, it ap-

peared that the signature page was missing. After considerable questioning, he admitted that page seven, the signature page, had been torn out of the copy. He said it was torn out of his copy by Everist at Parkersburg. He was unable to explain why he failed to disclose that he retained this copy and why he did not disclose that the copy had been altered in this manner when he produced it in court and represented it to be the copy which he had received from Boswell on May 10. Myers-Western has been unable to produce this missing signature page, the evidence of Everist being that when he tore off the signature page of the copy retained by Goen, that he threw it into the waste basket. The conduct of Goen with reference to this important document is most suspicious to say the least. There is strong reason to believe that he actually signed this copy of the agreement of April 28, as indicated in his letter of May 15, and that he subsequently changed his mind and decided upon this method of elimination of evidence of his signature. His contradictory statements as to his present possession of this copy of the agreement, his failure to disclose the missing page until forced to do so, his demeanor and appearance on the witness stand, and many other contradictions in his testimony, weigh heavily upon his credibility. However, he is corroborated by Everist who stated that he tore out the signature page because it contained Boswell's signature and that when he tore it out Goen had not signed. But under the facts of this case it is not necessary to decide whether Goen actually signed these papers. The contract of settlement was consummated without his signature.

There is no doubt as to what happened on April 19. The attorneys who were delegated to represent both Haddad and Myers-Western intended to and did enter into a binding contract of settlement effective immediately. The only dispute is whether Boreman, the agent of Myers-Western, had authority from his principal to enter into such oral agreement of settlement. That Hoff and Hiteshew had such authority is not denied. There is no contention that Boreman did not correctly and accurately carry out the wishes and instructions of his principal as to the terms of the contract

itself. Indeed, the evidence shows that he was an able and meticulous negotiator, and succeeded in selling most wishes of Myers-Western to Haddad. There is little, if any, complaint by anyone as to the terms of the oral or written agreements. The only complaint is that he had no authority to bind Myers-Western as he did by oral agreement. There is a sharp dispute in the evidence as to the instructions given Boreman, involving the credibility of witnesses.

Boyle and Gebbard, both representatives of Myers-Western, testified that they were present at Boreman's office on April 11, at which time they say Boswell, in effect, told Boreman that any contract with Haddad had to be reduced to writing and that no compromise agreement would be binding upon Myers-Western until both Western and Myers had signed the written agreement, and that they would be under no obligation to sign the written agreement unless they saw fit. Boswell was ill and did not personally testify at the trial, although a part of his deposition was used. Boreman denies receiving such instructions then or at any other time. With reference to that conference Boreman said: "Mr. Boswell was obviously very much under the influence of alcohol, in fact, and to state it plainly, he was drunk. It appeared that Mr. Goen, as I now recall, was leaving Parkersburg on an afternoon train and that Mr. Boswell, Mr. Goen and perhaps others had been drinking, and that Mr. Boswell and others had escorted Mr. Goen to the train before coming to my office. Mr. Boswell's conduct on occasion of that visit was such that it was most offensive to the secretaries in my office, if not actually insulting, and for which I apologized to them because they were my employees and Mr. Boswell was representing a client." He testified that the atmosphere of the conference was one of incoherence and confusion. Boyle and Gebbard deny that they were drinking or that Boswell was drunk. Boyle admitted that in the previous conference on April 4, when all parties were represented and at which time the third alternate proposal of Myers-Western was made, that nothing was said as to whether the agreement would be oral or in writing. Boreman said "Both Mr. Boyle and Mr. Gebbard have testified, in substance, that I violated by instructions as counsel for Myers-Western by committing Myers-Western on an oral agreement. This I emphatically deny." He stated that late in the afternoon of April 19 he informed his client by telephone that the offer had been accepted, with the result that on April 20 C. H. Guhne, office manager of Myers-Western in Parkersburg, and Gebbard, superintendent of construction at Parkersburg, came to his office "stating, in substance, that since a compromise agreement had been reached, the expense of continuing the services of Cramer & Cramer would not be justified since the objective had been accomplished." This was a firm of public accountants which had been employed by Myers-Western to keep a record of all cost and materials entering into the completion of the job by Myers-Western. Boreman advised that in his opinion such services were no longer necessary but suggested that they contact their superior officers of Myers-Western for confirmation. Boreman was subsequently informed by Guhne that he had received instructions from his superiors to terminate the services of these accountants, which was done, and the accountants made their last check of labor and materials on April 22. Boyle and Gebbard testified that the oral agreement had nothing to do with the termination of such services, and that such action was taken for reasons of economy only. After April 19 and before the April 28 agreement was signed by anyone, Hiteshew and Boreman agreed that Hiteshew should proceed to have the claims of Haddad's creditors filed with him as provided in that agreement. The surety company made no effort to check the labor and materials going into the job after April 19. Haddad withdrew his engineer from the job. All parties treated the case as settled and acted accordingly.

■ Boreman is an able and ethical attorney, as illustrated by his attitude in not disclosing any of these confidential communications with his client when he was first called as a witness, despite the fact that circumstances had made it necessary for him to withdraw as counsel. But after his client put on witnesses which challenged

**222**

his professional conduct and integrity, he felt that any restrictions on his testimony had been removed, and that in justice to himself as an attorney and as a witness in the case he was impelled to testify again and to relate the matters mentioned above. This conflict in the evidence requires me to determine the weight and credibility of this evidence. The facts related above convince me that Boreman has told the truth and that he acted within his authority in making a binding oral agreement of settlement on April 19.

But if Boreman did exceed his authority, and if there was no binding oral agreement, there was still a consummated written agreement of settlement. Myers-Western admits that it was a partnership in this project. There were only two parties to the written agreement of April 28, "Myers-Western, party of the first part, and Said S. Haddad * * * party of the second part". Both parties signed the agreement. An examination of the signature page shows that Boswell did not sign for Western, but that he signed "Myers-Western, By H. C. Boswell". He was the man who was selected and held out to be in charge for the partnership. He signed the May 8 agreement and the Kindig agreement for "Myers-Western By H. C. Boswell". Contention is made that the partnership of Myers-Western is not bound because both partners did not actually sign the agreement of April 28. If this were true, Myers-Western would not be bound by its subcontract with Haddad for the same reason. That subcontract, calling for more than $150,000 in work is between "Myers-Western and Said S. Haddad", and signed by "Said S. Haddad" and "Myers-Western, By Foster Myers, Gen. Supt." Western was located in Sioux City, Ia., the Myers Company was located in Salem, Indiana, and the work was in West Virginia, making it necessary for the partnership to act through agents of each partner. There is no contention that Boswell did not have full authority to act for Western. By signing the April 28 agreement in this manner he fully executed it for the partnership.

In 30 A.J., page 699, the rule is stated as follows: "Accordingly, as a general rule, each of several joint adventurers has power to bind the others and to subject them to liability to third persons in matters which are strictly within the scope of the joint enterprise", citing Chisholm v. Gilmer, 4 Cir., 81 F.2d 120 at page 124 (affirmed in 299 U.S. 99, 57 S.Ct. 65, 81 L.Ed. 63), wherein Judge Parker in his opinion at page 124 says: "There can be no question as to the responsibility of the joint adventurers for liabilities incurred within the scope of the enterprise." When Goen, a partner of Myers, received the papers, signed by Boswell for the partnership, he, too, consented to, the same and so notified Western. The Myers Company is bound by the telegram from Boyle to Boreman dated May 19. It is bound, irrespective of the proposition that the telegram of one partner or joint adventurer binds the other. By consenting to the written agreement in its letter to Western, it joined in the telegram which clearly indicated that the April 28 and May 8 agreements had been signed. Cobb v. Glenn Boom & Lumber Company, 57 W. Va. 49, 49 S.E. 1005, 1007, 110 Am.St.Rep. 734; Lawrence v. Potter, 91 W.Va. 361, 113 S.E. 266, 272. It seems clear that Goen knew that such message would be sent on to Boreman and thence to Haddad's attorneys.

In the Cobb case [57 W.Va. 49, 49 S.E. 1007] the West Virginia Supreme Court said: "* * * This brings us to the question, is the contract made by the letters and telegrams such a one as meets the requirements of the statute of frauds above referred to? It is not necessary that the whole agreement should be written upon one piece of paper, but if it can be fully collected from various papers referring to one another, or directly related to one another, such as letters and telegrams written and sent, and the replies thereto, so that they may be fairly said to constitute one paper relating to the contract, it is a sufficient agreement, if it appears that the minds of the parties met, and if the terms of the contract, by referring to the various writings, can be made to clearly appear. * * *"

Goen cannot escape responsibility for his approval of the agreements by saying that he wrote his letter before reading the papers. Green's Executors v. Smith, 146 Va. 442, 131 S.E. 846, 44 A.L.R. 1175;

Watson v. Coast et al., 35 W.Va. 463, 14 S.E. 249.

[9] In 30 A.J. 41, it is stated: "A joint adventurer can bind his associates by contracts reasonably necessary to carry on the venture with respect to matters in which he has given express or apparent authority."

In all the dealings with Boreman and Haddad, apparent authority to act for the joint venture was in Boswell, and in his absence Boyle gave instructions, both being connected with Western.

It is apparent from all this evidence that when Goen showed these papers to his father-in-law, who had not personally participated in the settlement agreement, the latter suggested that he not sign until they went to Parkersburg and found out how much the completion of the job was costing. When they examined the figures they found the job was in the red at least $25,000 and it was then that Everist, the president of Western, and Goen, a parner of the Myers Company, decided that the offer which they had made to Haddad was a bad one, and that they would not go through with the deal. They should have made this investigation before making their offer of settlement. Everist proceeded to tear out the signature page where Boswell had signed on one paper and to cut Boswell's signature out of another paper. This throws some light on why these papers were never returned and why the mutilated copies could not be obtained up to the actual time of trial, although copies of the agreement bearing Boswell's signature which were not mutilated were furnished to counsel in advance of trial. Copies of the mutilated papers were not furnished by Myers-Western's present counsel because they, too, were not informed about the mutilations. In this respect the bad faith of Myers-Western continued after repudiation of its agreement. It was not until June 21 that Myers-Western let their attorney know that the papers would not be returned. They decided not to return them on May 23, more than one month after such offer had been accepted by Haddad, after all parties, including Myers-Western, had treated the controversy as settled, and acted accordingly. Boswell testified

that the reason the papers were not signed was that it would cost more money to complete Haddad's subcontract than the contract price and that "we would not entertain releasing the surety company". He makes this statement in the face of the fact that he had actually signed the April 28 agreement, Article Three of which provided as follows: "Myers-Western hereby fully releases Haddad from the 'Performance Bond' of September 21, 1944, thereby releasing also his surety, National Surety Corporation".

The oral agreement of April 19 was reduced to writing solely for the purpose of making a memorandum of the details of the existing parole compromise agreement. This was the same procedure followed by the parties in the November 15 agreement. There a binding oral agreement of settlement was reached and then reduced to writing for record purposes only, in the form of a letter from Haddad to Myers-Western. The letter was signed by Haddad but was never signed by Myers-Western, yet Myers-Western liked that settlement agreement and relies upon it in this case as a binding agreement releasing it from all damages because of any failure on its part to give Haddad a place to work. It cannot now be permitted to say that it does no business by oral contract just because such contract does not turn out as profitable as anticipated.

Where the creditor releases a principal, the surety is discharged, unless (a) the surety consents to remain liable notwithstanding the release, or (b) the creditor in the release reserves his rights against the surety. Restatement of the Law of Security, Sec. 122.

Myers-Western contends that because Haddad elected to bring suit upon the subcontract rather than upon the settlement agreement, he has repudiated such settlement agreement and such action by Haddad precludes discharge of National Surety. I see no merit in this argument. When Haddad was discharged, his surety was discharged, and such discharge of the surety was not revoked by any subsequent action of Haddad. The fact is that Haddad has not repudiated the settlement agree-

ment. Upon *repudiation* by Myers-Western, he had an election and he has done nothing more than to exercise such election.

Myers-Western contends that National Surety is nothing more than a creditor beneficiary and cites authorities to show that a discharge of a promisor by a promisee is effective against a creditor beneficiary only where the creditor beneficiary does not bring suit upon the promise or otherwise materially change his position in reliance thereon before he knows of the discharge. This rule is wholly inapplicable here because this is a case of suretyship and we only need to apply the well established rule of suretyship mentioned above to see that National Surety was permanently discharged when Haddad was discharged, and no subsequent action by Haddad can revive that liability. National Surety relies upon this rule of suretyship for its discharge, not upon any status of a creditor beneficiary.

I conclude that there was a valid binding and consummated agreement between Myers-Western and Haddad whereby all matters in difference between Myers-Western and Haddad were compromised and settled, and that the discharge of Haddad operated to discharge National Surety from liability upon its performance bond. The motion of National Surety for summary judgment and for judgment on the pleadings may be overruled, since the case was heard fully upon the merits. Upon such hearing I find that National Surety is not further liable on its performance bond and an order may be entered accordingly.