**AMTOTE INTERNATIONAL, INC., Plaintiff,**

v.

**PNGI CHARLES TOWN GAMING LIMITED LIABILITY COMPANY, et al., Defendants.**

**Civil Action No. 3:97–CV–146.**

United States District Court, N.D. West Virginia, Martinsburg Division.

Sept. 30, 1999.

Richard L. Douglas, Douglas & Jenkinson, Martinsburg, WV, Gerard J. Gaeng, Rosenberg, Proutt, Funk & Greenberg, LLC, Baltimore, MD, for Plaintiff.

Sarah R. Carden, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, Benjamin L. Bailey, Bailey & Glasser LLP, Charleston, WV, Walter M. Jones, III, Martin & Seibert, Martinsburg, WV, David Povich, William R. Murray, Jr., Sean Eskovitz, Williams & Connolly, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

BROADWATER, District Judge.

The above-styled matter is currently pending before the Court for consideration of the parties' respective motions for summary judgment. The issues have been fully briefed, and counsel presented oral argument on June 17, 1999. For reasons set forth below, the Court grants summary judgment in favor of the plaintiff against the defendants.

### I. PROCEDURAL HISTORY

On December 17, 1997, AmTote International, Inc. (AmTote), a Delaware corporation with its principal place of business in Hunt Valley, Maryland, brought suit in diversity against PNGI Charles Town Gaming Limited Liability Company (PNGI), a West Virginia limited liability company with its principal place of business in Charles Town, West Virginia, and Penn National Gaming, Inc. (Penn National), a Pennsylvania corporation with its principal place of business in Wyomissing, Pennsylvania. PNGI and Penn National are hereinafter referred to collectively as Penn National.

In its complaint, AmTote sought injunctive and declaratory relief seeking to enforce its claimed seven-year contract to provide computerized wagering services ("tote services") to the Charles Town Race Track (Track), located in Charles Town, West Virginia.

The Court conducted a telephonic status conference on December 23, 1997. Thereafter, the Court on December 24, 1997 entered a temporary restraining order prohibiting Penn National from displacing AmTote as the provider of tote services at the Track.

On January 14, 1998, the Court heard testimony and oral argument on AmTote's

motion for a preliminary injunction. At the hearing and in its pre-hearing memorandum, Penn National argued that injunctive relief was inappropriate. Penn National asserted that AmTote had an adequate remedy at law. This remedy was the liquidated damages provision in the Wagering Service Agreement that AmTote sought to enforce.

On January 29, 1998, Penn National filed counterclaims against AmTote alleging that AmTote had breached an obligation to pay a $500,000 grant to the owner of the Track. On February 20, 1998, the Court issued a Memorandum Opinion and Order lifting the temporary restraining order and denying AmTote's motion for a preliminary injunction.

The Court then entered an order on August 14, 1998, granting AmTote's motion for leave to file its First Amended Verified Complaint (Amended Complaint). In the Amended Complaint, AmTote sought damages for Penn National's breach of AmTote's alleged seven-year contract to provide tote services to the Track. In addition, AmTote joined GTECH Corporation (GTECH), a Delaware corporation with its principal place of business in West Greenwich, Rhode Island. AmTote sought to align GTECH with the plaintiff for a declaration that a contractual $500,000 grant obligation was no longer outstanding. GTECH is the assignee of AmTote under a series of contracts described hereinafter.

On September 28, 1998, GTECH filed a motion to dismiss on the grounds that the Court lacked subject matter jurisdiction over the Amended Complaint due to the lack of complete diversity between AmTote and GTECH. The Court denied GTECH's motion to dismiss by Order dated December 3, 1998. The Court held that GTECH was properly aligned with AmTote as a plaintiff under the Amended Complaint, and therefore, complete diversity existed.

Thereafter, the Court conducted several hearings. By Order entered on April 14, 1999, the parties were directed to file their respective motions for summary judgment.

After fully briefing the issues, the parties presented oral argument on June 17, 1999.

## II. FACTS

For numerous years, AmTote provided computerized pari-mutuel services, known as totalisator or "tote" services, to the Charles Town Track. During the period from 1994 to 1996, AmTote was a wholly-owned subsidiary of GTECH.

Until January 15, 1997, Charles Town Races, Inc. ("CTR") and Charles Town Racing Limited Partnership ("CTRLP") owned the Track. CTR and CTRLP were the local entities that bargained for and entered into a basic set of contracts that lies at the heart of this litigation.

On September 9, 1994, CTR and AmTote entered into a Wagering Services Agreement. This contract updated previous agreements for the years 1980, 1986, and 1991.

Pursuant to the Wagering Services Agreement, AmTote agreed to continue its existing relationship as the exclusive supplier of tote services and equipment for pari-mutuel wagering at the Track. Compensation for AmTote's services was determined according to a schedule attached as Exhibit C to the Wagering Services Agreement. The base compensation was computed by multiplying the total daily wagers on live and simulcast racing events shown at the Track (the "handle") by a factor of 0.005 (or 0.5%). According to its original term, the Wagering Services Agreement was to expire on December 31, 1996.

Section 15.2 of the Wagering Services Agreement provided, in part, that:

[T]he Association shall pay to AmTote as liquidated damages for breach of this Agreement for each Operating Year or portion thereof remaining in the term of this Agreement at the date of such termination, an amount equal to the total service fees paid by the Association to AmTote during the twelve (12) months preceding such termination. The total

amount of liquidated damages shall be paid to AmTote promptly upon demand.

During this time, CTR began to explore its options regarding video lottery. CTR negotiated with Autotote and AmTote for the provision of video lottery terminals if and when Jefferson County, West Virginia passed a referendum approving video lottery. A referendum was then scheduled for November 1994 (1994 Referendum), whereby the voters of Jefferson County would either approve or disapprove of the use of video lottery terminals (VLTs) at the Track.

These negotiations culminated in the Binding Agreement dated October 20, 1994. AmTote gained the right to be the exclusive provider of both tote services and video lottery services in exchange for a $750,000 loan and a $50,000 grant, as well as another $500,000 grant to be paid upon the installation of video lottery, plus interrelated fees for tote services. Pursuant to Sections 2 and 3 of the Binding Agreement, CTR agreed to acquire from AmTote the "installation and operation" of a video lottery system.

AmTote and CTR understood that the VLTs and related services would be furnished by GTECH, which was then AmTote's parent corporation. The Binding Agreement contemplated that AmTote would utilize 200 VLTs manufactured by GTECH and 200 VLTs manufactured by an entity other than GTECH (Binding Agreement, Section 2(a)). However, Section 11 of the Binding Agreement allowed AmTote to procure VLTs from sources other than GTECH if GTECH did not gain a license to provide its video lottery equipment to racetracks in West Virginia.

Section 17(a) of the Binding Agreement expressly authorized AmTote to assign without CTR's prior consent "... any or all of the Loan Agreement, Note, Wagering Services Agreement, this Binding Agreement, or Gaming Services Agreement to the parent or to any subsidiary of AmTote or such parent or to a successor to all or substantially all of AmTote's assets or capital stock."

Per Section 4 of the Binding Agreement, if the 1994 Referendum passed, AmTote agreed to reduce the fee for its pari-mutuel services from 0.5% of the handle to 0.33% of the handle. However, if the video lottery system was not in operation by May 15, 1995, the fee for AmTote's parimutuel services was to remain at 0.5% of the handle until such time that the video lottery system commenced operation.

Section 1 of the Binding Agreement made reference to a Gaming Services Agreement that might be entered into between AmTote and CTR. No such agreement was entered into by the parties. Pursuant to Section 2 of the Binding Agreement, if no Gaming Services Agreement was reached by the parties, the Binding Agreement would continue "in effect for the Term (as defined in Section 5)."

Section 5 of the Binding Agreement defined "the Term." This Section provided that the Binding Agreement would remain in effect for seven years from the "installation and initial operation of the video lottery system." Section 5 further provided that the term of the Wagering Services Agreement was extended to the later of "(a) December 31, 1996, or (b) the expiration or earlier termination of the Term." It appears that the parties understood and agreed that AmTote's right to provide exclusive tote services at the Track would expire on December 31, 1996 if the video lottery system was not approved and implemented, but would be extended to a 7–Year Term if the video lottery system was approved and implemented.

The video lottery referendum went before the voters of Jefferson County and was defeated in November 1994. In light of the failed referendum, CTR closed the Track and considered selling the facility.

In order to clarify their positions as they related to the Binding Agreement after the failed referendum, AmTote and CTR entered into additional negotiations. After these negotiations, the parties entered into the Amendment Agreement to the Binding Agreement (Binding Agreement Amend-

ment) dated January 1, 1995 and the Amendment Agreement No. 1 Wagering Services Agreement (Wagering Services Agreement Amendment) dated February 1, 1995. While these agreements bear separate dates, both instruments were executed at the same time by the parties during the week of March 20, 1995.

As a result of the failed 1994 Referendum, CTR started negotiations for the sale of the Track. This was known by AmTote. Paragraph E of the Binding Agreement Amendment acknowledged that AmTote was "entitled to continue in the role as the exclusive provider of pari-mutuel services" at the Track after the sale.

Paragraph 2 of the Binding Agreement Amendment provided that:

In connection with (i) any sale, transfer, disposition, merger, reorganization or other transaction the result of which is a change in ownership or control of Charles Town Races or (ii) any sale, transfer or disposition of the stock of [CTR] or all or substantially all of the assets of CTRLP and following such event the purchaser/controlling party (the "Third Party") continues to operate Charles Town Races as a facility for the conduct of wagering, [CTR] and CTRLP agree to cause the Third Party to accept and assume the Binding Agreement, as hereby amended, as contemplated when the Binding Agreement was negotiated and executed by AmTote and [CTR].

Paragraph 6 of the Binding Agreement Amendment provided that:

The Wagering Services Agreement and Binding Agreement, as amended, will expire on 31 December 1997, provided that on or prior to such date (i) the Referendum has not been approved and (ii) the Loan has been repaid in full. If the Referendum has been approved, then the Wagering Services Agreement and Binding Agreement remain in effect pursuant to their respective terms.

Consistent with the Binding Agreement Amendment, which was executed at the same time as the Wagering Services Agreement Amendment, Paragraph 2 of

the Wagering Services Agreement Amendment provided that the Wagering Services Agreement was amended to reflect the new minimum fixed term of December 31, 1997. It appears from the Wagering Services Agreement Amendment that, if the video lottery system at the Track was approved by referendum prior to December 31, 1997, the term of the Wagering Services Agreement would automatically extend for seven years from the actual date of VLT installation by reason of Paragraph 6 of the Binding Agreement Amendment. If the second referendum did not pass, the fixed term till December 31, 1997 would control.

When the parties executed the Wagering Services Agreement Amendment and the Binding Agreement Amendment in March 1995, GTECH had publicly announced its intention to sell AmTote.

After a series of negotiations, Mudge Acquisition Group, Inc., a Maryland corporation, entered into an agreement with GTECH dated February 20, 1996. The agreement provided for the purchase of all the issued and outstanding stock of AmTote. At the same time, and acting under the provisions of Section 17(a) of the Binding Agreement, GTECH and AmTote entered into an Assignment and Assumption Agreement (GTECH Assignment) dated February 22, 1996. Although bearing different dates, the agreements were executed simultaneously as a result of these parties' negotiations.

Pursuant to Section 1 of the GTECH Assignment, AmTote assigned to GTECH "all of AmTote's rights, title, interest, and liabilities and obligations" under the Binding Agreement to provide a VLT system to the Track. As part of the GTECH Assignment, as set forth in Section 2, GTECH assumed the obligation to pay $500,000 to CTR upon the commencement of video lottery operations. AmTote did not assign to GTECH its rights under the Binding Agreement and Wagering Services Agreement to be the exclusive provider of pari-mutuel tote services to the

Track. AmTote retained those rights and continued to provide these services.

Due to the unique combination of horse racing and video lottery within the Baltimore–Washington metropolitan area, CTR continued negotiations throughout 1996 to sell the Track. One of these potential buyers was Penn National.

During this period of time, CTR closed the track. With the resulting economic impact to Jefferson County, the political positions on video lottery gaming began to change. The County Commission of Jefferson County then placed the video lottery referendum back before the voters in the 1996 general election (1996 Referendum).

By the spring of 1996, with the second referendum pending, Robert Bork, Penn National's chief operations officer, approached Keith Wagner, CTR's chief executive officer, about a potential purchase of the Track. Wagner provided Penn National with copies of all the contracts Penn National would have to assume. Bork forwarded copies of the AmTote/GTECH contract to Autotote's Richard Pollard for his view as to whether it constituted a binding agreement. Autotote was a tote services competitor of AmTote. As well, GTECH gave notice to Penn National that it was the assignee of the VLT portions of the contract. Letter from GTECH to James Reeder, dated April 10, 1996.

In the purchase discussions between Penn National's Bork and CTR, Wagner made it clear that Penn National would be required to assume the AmTote/GTECH contracts and that the AmTote/GTECH contract terms would be extended up to seven years if the referendum passed prior to December 31, 1997. Wagner Deposition, pp. 82–83, 88–89. Bork complained to Wagner about having to purchase the track subject to the extended term. (Wagner Deposition, p. 88–89).

Penn National's legal counsel, Robert P. Krauss, after reviewing the Binding Agreement Amendment in April 1996, advised Penn National as follows:

It is my duty (but certainly not my pleasure) to deliver to you a copy of the Amendment to the AmTote Agreement which I have just received from Mike Keller.... I am not optimistic that there is a way around this Amendment. Accordingly, it appears that a straight business negotiation will be required.

Letter from Robert Krauss to Peter Carlino, dated April 2, 1996, with cc: William Bork

On November 5, 1996, the voters of Jefferson County approved the 1996 Referendum authorizing the installation of VLTs at the Track. In December 1996, Penn National and CTR were in the process of finalizing the sale of the Track.

On December 11, 1996, GTECH filed suit in this Court (the "GTECH litigation") against, *inter alia*, CTR and Penn National, to enforce GTECH's rights under the Binding Agreement, the Binding Agreement Amendment, and the GTECH Assignment. Penn National defended on the ground, *inter alia*, that the Binding Agreement did not permit partial assignments and instead required provisions of VLT and tote services by a single provider.

On January 15, 1997, Penn National purchased the Track from CTR. Pursuant to Section 2 of the Transfer, Assignment and Assumption Agreement and Bill of Sale (Transfer Agreement), CTR assigned to Penn National, and Penn National assumed, the Wagering Services Agreement, the Binding Agreement, the Binding Agreement Amendment and the Wagering Services Agreement Amendment. Thus, Penn National became the successor-in-interest to CTR with respect to those agreements.

On May 23, 1997, this Court issued a preliminary injunction in the GTECH litigation. In that decision, this Court made a preliminary ruling that AmTote's partial assignment of the Binding Agreement to GTECH was valid. *GTech Corp. v. Charles Town Races, Inc.,* 1997 WL 529053 (N.D.W.Va., May 23, 1997)(No.

CIV.A.3:96–CV–72). The parties ultimately settled their differences and entered into an agreement dated June 25, 1997, referred to in this civil action as the "Superseding VLT Agreement".

As part of the settlement of the GTECH litigation, GTECH and Penn National entered into the Superseding VLT Agreement, whereby GTECH agreed to provide VLTs to the Track for a term to end five years after the installation of 400 VLTs at the Track.

During the negotiation of the Superseding VLT Agreement, GTECH and Penn National discussed and rejected Penn National's request to maintain the $500,000 grant obligation as part of the new arrangement. GTECH letter to Penn National dated April 9, 1997. As part of the Superseding VLT Agreement, Penn National and GTECH stipulated to the dismissal with prejudice of the GTECH litigation and all claims raised therein concerning the parties' respective rights under the Binding Agreement and Binding Agreement Amendment. Superseding VLT Agreement Section 20.1. That stipulation was confirmed by Order of this Court dated July 14, 1997, dismissing all claims with prejudice. Penn National also dismissed its appeal to the United States Court of Appeals for the Fourth Circuit of this Court's preliminary injunction in favor of GTECH.

Section 20.1 of the Superseding VLT Agreement provided:

This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter, and supersedes all prior agreements and understandings of the parties, written and oral, related thereto.

The Superseding VLT Agreement did not contain any provision reserving Penn National's right to a $500,000 grant against AmTote. Such a reservation of rights was not discussed as part of Penn National's negotiations for the Superseding VLT Agreement. Bork Deposition pp. 64–65.

On September 15, 1997, GTECH installed VLTs at the Track. Penn National did not request payment of the $500,000 grant from either GTECH or AmTote.

After the assumption by Penn National of the agreements referred to above, Penn National and AmTote continued to operate under the terms of the Wagering Services Agreement, the Binding Agreement, the Binding Agreement Amendment and the Wagering Services Agreement Amendment.

About the time when Penn National and GTECH settled their litigation and entered into the Superseding VLT Agreement, AmTote expressed its position that it had a contract to provide tote services for a term of five years. AmTote letter to CTR, dated July 31, 1997 (stating "it is our understanding, based upon knowledge of the settlement which Charles Town has reached with GTECH, that the term for our Wagering Services Agreement has been set at five years subject to Charles Town's buy-out right pursuant to the same agreement.").

Relying on the termination date of December 31, 1997 discussed in the Wagering Services Agreement Amendment, Penn National denied that AmTote had a contract beyond December 31, 1997.

In an attempt to resolve the matter, Penn National offered AmTote a compromise. If AmTote would agree not to sue Penn National over its interpretation of the CTR contracts, Penn National would permit AmTote to submit a bid for tote services at all three of its race tracks.

During October 1997, AmTote attempted to expand its contracts with Penn National by bidding to provide tote services to two additional race tracks owned by Penn National. AmTote's bid was communicated in an October 14, 1997 letter from AmTote's President, Edmund T. Mudge, IV, to Penn National's Vice President, Philip T. O'Hara, Jr. AmTote made clear in this bid letter that AmTote's bid was not a waiver of its existing seven-year contract to provide pari-mutuel tote services to the Track pursuant to the Binding Agreement.

On November 7, 1997, Penn National informed AmTote by letter that AmTote would not be given a new contract for the work proposed in the bid letter.

On November 18, 1997, AmTote confirmed, by letter to Penn National, its continuing commitment to perform at the Track under the Binding Agreement:

> I would like to personally thank you for giving AmTote the opportunity to bid on all three Penn National properties and their OTBs. We are disappointed that our bid was not accepted. However, we do look forward to providing superior service to your Charles Town track pursuant to our seven year binding contract that Penn National assumed when it purchased Charles Town.

By letter dated December 4, 1997, Penn National's Bork informed AmTote's Mudge that Penn National did not intend to honor the 7–Year Term and intended to attempt to terminate the relationship with AmTote on December 31, 1997. Also, Penn National intended to replace AmTote equipment, systems and personnel at the track with those of a competitor, Autotote Corporation.

Penn National entered into an agreement with Autotote that made Autotote the exclusive provider of tote services at the Track commencing on or about January 1, 1998.

By letter dated February 26, 1998 from Bork to Mudge, Penn National ordered AmTote to remove its equipment, systems and personnel from the Charles Town Race Track by March 9, 1998. This prevented AmTote from continuing to perform as the exclusive provider of pari-mutuel tote services.

By letter dated April 3, 1998, AmTote gave notice to the Track and Penn National of the latter's defaults under the Wagering Services Agreement as amended. Penn National did not cure those defaults.

By letter dated May 8, 1998, AmTote gave notice to the Track and Penn National of the termination of the Wagering Services Agreement, as amended, as a result of the above. AmTote demanded liquidated damages in the amount of $1,807,-325.24 pursuant to Section 15.2 of the Wagering Services Agreement. This section required that such damages "be paid to AmTote promptly upon demand." Penn National did not pay the liquidated damages upon demand.

On November 17, 1998, Penn National exercised its buy-out rights under the terms of the Superseding VLT Agreement and on that same day, GTECH ceased being the provider of video lottery at Charles Town Races.

### III. DISCUSSION

██ The parties are in agreement that the contract law of West Virginia controls in this diversity action. Therefore, the Court's reading of the various agreements is limited in that "[a] valid written instrument which expressed the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." *Bennett v. Dove,* 166 W.Va. 772, 277 S.E.2d 617, 619 (1981) (citations omitted). Also, "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or difficult contract for them." *Id.* at 619. Furthermore, "[i]t is the safest and best mode of construction to give words, free from ambiguity, their plain and ordinary meaning." *Id.* at 619 (citing *Williams v. South Penn Oil Co.,* 52 W.Va. 181, 43 S.E. 214 (1903), Syllabus Point 4).

### A. TERM

██ The Binding Agreement Amendment and the Wagering Services Agreement Amendment were executed simultaneously. For that reason, they cannot be read without reference to one another, and therefore the two amendments must be read together in a manner that is consistent. *Pertee v. Goodyear Tire & Rubber Co.,* 861 F.Supp. 523, 526 (S.D.W.Va.,

1994), *aff'd,* 67 F.3d 296 (4th Cir.1995) The Court in *Pertee* held "[a]s a general rule, separate writings 'will be construed together and considered to constitute one transaction when the parties are the same, the subject matter is the same and the relationship between the documents is clearly apparent.'" *Id.* at 526 (quoting *Ashland Oil, Inc. v. Donahue,* 159 W.Va. 463, 469, 223 S.E.2d 433, 437 (1976)).

■ In the document on which the Amendments were based, the Binding Agreement, the terms of the provision of VLT and tote services were related. The extended seven-year term for tote services depended on the installation of VLTs at the Track. Therefore, the Wagering Services Agreement cannot be read in isolation from the Binding Agreement Amendment or the Binding Agreement. When the various agreements are read together, they lead to the conclusion that AmTote's contract to provide tote services at the Track extended until September 15, 2004, seven years after installation of VLTs at the Track.

Section 5 of the Binding Agreement provided that if a referendum were approved, the Binding Agreement would remain in effect for seven years from installation and operation of the VLTs. No term was set for the expiration of the Binding Agreement in the event that the 1994 referendum failed. The Binding Agreement provided that the term of the Wagering Services Agreement regarding tote services was extended to the later of December 31, 1996 or, in the event that video gaming was approved, the 7–Year Term.

The March 1995 amendments were executed after the defeat of the 1994 Referendum but prior to the 1996 Referendum. The amendments were executed in order to (1) increase the minimum fixed term from December 31, 1996 to December 31, 1997 to ensure that AmTote would provide tote services at least through the election, (2) reduce certain minimum tote fees charged to CTR by AmTote, and (3) provide for the first time that the Binding Agreement itself would expire if video

gaming were not approved by December 31, 1997. There were no agreements or discussions about altering the contingent 7–Year Term that would govern the Wagering Services Agreement in the event that the referendum did pass.

Paragraph 6 of the Binding Agreement Amendment provided that the Binding Agreement would extend to at least December 31, 1997. And, if a VLT referendum was approved before that time, the Binding Agreement and Wagering Services Agreement would "remain in effect pursuant to their respective terms." Those "respective terms" included those terms in the Binding Agreement providing that the length of the Wagering Services Agreement was extended to seven years upon installation of VLTs.

The fee arrangement between the parties also supports the conclusion that AmTote's right to provide tote services to the Track would extend for seven years if a video lottery referendum passed prior to December 31, 1997. Paragraph 2 of the Wagering Services Agreement Amendment confirmed that the new minimum fixed term for AmTote's tote service contract was December 31, 1997. As well, Paragraph 3 provided for immediate, temporary reductions in many of the service fees charged by AmTote. The tote service fees would revert to their prior levels if the 1996 Referendum passed and the VLTs were installed.

Thus, by the plain language of the two Amendments, read together, AmTote's contract to provide tote services was to expire on December 31, 1997 if the 1996 Referendum failed. However, if the 1996 Referendum passed, AmTote's right to provide tote services would expire seven years from the date of installation of VLTs.

**B. ASSIGNMENT**

■ The record in this case, like the record in the GTECH litigation, leads to the conclusion that the GTECH Assignment did not violate the Binding Agree-

ment. This conclusion is supported by important distinctions in the assignment rights accorded to AmTote and CTR in the Binding Agreement. Section 17(b) of the Binding Agreement permitted CTR to assign "the Loan Agreement, Note, Wagering Services Agreement, this Binding Agreement and Gaming Services Agreement." The use of the restrictive conjunction "and" comports with CTR's obligation, spelled out in the Binding Agreement Amendment, to ensure that any purchaser of the Track would assume all of the contracts. This preserved AmTote's rights to provide tote and VLT services at the Track pursuant to the Binding Agreement Amendment, Recital E and Paragraph 2. Thus, CTR was required to assign all of the listed contracts together.

 AmTote's assignment rights, set forth in Section 17(a) of the Binding Agreement, allowed it to assign "any or all of the Loan Agreement, Note, Wagering Services Agreement, this Binding Agreement or Gaming Services Amendment." The use of the non-restrictive conjunction "or" indicates that the phrase "any or all" was to apply to each listed contract. Thus, AmTote was free to assign "any or all" of the Loan Agreement, "any or all" of the Wagering Services Agreement, or "any or all" of the Binding Agreement. As a result, AmTote was within its contractual rights to assign the VLT portions of the Binding Agreement to GTECH while retaining the tote portions of the Binding Agreement.

This interpretation is entirely consistent with the very first definition of the term "any" in an authoritative legal dictionary. *See Black's Law Dictionary* 94 (6th ed.1990) (defining "any" as "some"). Thus, by the unambiguous terms of the Binding Agreement, AmTote was permitted to assign "some or all" of the Loan Agreement, "some or all" of the Wagering Services Agreement, or "some or all" of the Binding Agreement.

Penn National argued that while Am-Tote was permitted to assign one or more of the listed contracts in their entirety, it could not assign distinct portions of those contracts. Under this theory, however, AmTote was still entitled to separate the VLT rights and obligations from the tote services rights and obligations. For instance, had AmTote assigned only the Wagering Services Agreement, this would have had the effect of splitting tote services from VLTs. Similarly, had AmTote and CTR entered into the contemplated Gaming Services Agreement governing VLTs, AmTote's assignment of that contract by itself would also have split tote services from VLTs. Thus, both Penn National's and AmTote's interpretations of the assignment provisions in the Binding Agreement lead to the same conclusion, that AmTote could assign the VLT provisions without assigning the tote provisions.

### C. GRANT

In its counterclaim, Penn National asserts that it is entitled to receive payment of the $500,000 grant referred to in Section 9 of the Binding Agreement. Pursuant to that provision, AmTote was required to pay $500,000 to CTR upon the initial operation of a video lottery system at the Track.

 The record in this case leads to the conclusion that Penn National released its right to enforce Section 9 of the Binding Agreement. This conclusion is the result of a three-step analysis. First, AmTote validly assigned, and GTECH assumed, the $500,000 grant obligation. Second, Penn National released GTECH from the $500,000 grant obligation. Third, Penn National's release of GTECH, by operation of law, also released AmTote from the $500,000 grant obligation.

 AmTote validly assigned, and GTECH validly assumed, the VLT provisions in the Binding Agreement, including the $500,000 Grant Obligation contained in Section 9 of that agreement. Upon execution of the assignment, AmTote, as the original obligor, by operation of law, became a surety for GTECH with regard to

the VLT obligations in the Binding Agreement assumed by GTECH, including the $500,000 grant provision in Section 9. *See Restatement of Security* § 83 (1941)("The suretyship relation is created where the surety ... (c) having been a principal obligor, his obligation, without a novation, has been assumed by another. . . . "); *Restatement* (Third) *of Suretyship and Guaranty* § .1, cmt. (Hereinafter the *"Restatement of Suretyship"*) (explaining that the relationship of principal and surety is created when "a person has become a principal obligor by a contract pursuant to which it assumed an obligation of another person to the obligee"); *Id. at* § 2(e) (stating that a secondary obligation is created "by contract between an obligor and another person [*e.g.*, the GTECH Assignment] pursuant to which, without a novation, the other person assumes a duty of the obligor to the obligee, with the result that the other person becomes the principal obligor and the original obligor becomes the secondary obligor"). *See also Gholson v. Savin*, 137 Ohio St. 551, 31 N.E.2d 858, 862 (1941).

The suretyship provisions of the *Restatement of Security* were superseded in 1996 by the *Restatement of Suretyship*. In the decision of *Lowe v. Albertazzie*, 516 S.E.2d 258 (W.Va., 1999), the West Virginia Supreme Court of Appeals recognized the controlling provisions of the *Restatement (Third) of Suretyship and Guaranty* (1996). The Court in *Lowe* relied upon the *Restatement* in construing W.Va.Code § 45–1–6 and in recognizing the doctrine of subsuretyship.

 To the extent that the provisions of the *Restatement of Suretyship* have been adopted, they provide the applicable standard of law. Moreover, the principle embodied in Section 122 of the *Restatement of Security* was embraced by the West Virginia Supreme Court in *State ex rel. Mayle v. Aetna Cas. & Sur. Co.*, 152 W.Va. 683, 166 S.E.2d 133, 136 (1969) (stating that "when the injured party is made whole by the principal, the obligation of the surety is extinguished").

Penn National concedes that the Superseding VLT Agreement released GTECH from all of its obligations under the Binding Agreement. *See* Defendant's Motion for a Hearing on Plaintiff's Motion for Leave to File Plaintiff's First Amended Verified Complaint, p. 4 ("[T]o avoid liability to Penn National [on the $500,000 obligation], GTECH will simply point to the Superseding VLT Agreement."); Memorandum in Opposition to Motion for Leave to File Plaintiff's First Amended Verified Complaint, p. 6 (conceding that "Penn National cannot even try" to assert a claim against GTECH); *Id.* ("In fact, the amended complaint specifically alleges that GTECH and Penn National settled their disputes, as the court already knows."); *Id.* (stating that Penn National is not "able to and/or interested in pursuing a claim against [GTECH]").

The Superseding VLT Agreement, entered into after this Court preliminarily affirmed the validity of the assignment of the VLT provisions to GTECH and the enforceability of the VLT portions of the Binding Agreement as between GTECH and Penn National, unmistakably "supersede[d] all prior agreements and understanding of the parties, written and oral," related to video lottery terminals at the Track. Superseding VLT Agreement Section 20.1. The $500,000 grant obligation contained in Section 9 of the Binding Agreement was one of the obligations related to video lottery terminals assumed by GTECH. Thus, as a matter of law, Penn National released GTECH from the $500,000 grant obligation.

The circumstances in this case indicate that Penn National clearly intended to discharge GTECH from the $500,000 grant obligation. In a conversation between Bork and GTECH's Robert Vincent during negotiations preceding the Superseding VLT Agreement, Bork raised the $500,000 issue. Affidavit of Robert Vincent, 4/21/99, paragraph 7. Vincent informed Bork that GTECH would not pay the $500,000. *Id.* This was confirmed in a letter from

GTECH's Riendeau to Bork dated April 9, 1997. The draft video lottery proposal sent by Bork to Vincent two days after Riendeau's letter no longer included the $500,000 payment in its terms.

 When Penn National entered into the Superseding VLT Agreement, thereby releasing GTECH from its obligations without reserving any rights against AmTote, AmTote's obligations were also discharged. *See Restatement of Security* § 122 ("Where the creditor releases a principal, the surety is discharged, unless (a) the surety consents to remain liable notwithstanding the release, or (b) the creditor in the release reserves his rights against the surety."); *Haddad v. Western Contracting Corp.*, 71 F.Supp. 212, 223 (N.D.W.Va., 1946) (quoting section 122 of the *Restatement of Security*); *Restatement of Suretyship* § 39(b) (providing that "the secondary obligor is discharged from any unperformed duties pursuant to the secondary obligation unless: (i) the terms of the release effect a preservation of the secondary obligor's recourse (§ 38); or (ii) the language or circumstances of the release otherwise show the obligee's intent to retain its claim against the secondary obligor."). Section 39(b) of the *Restatement of Suretyship* replaces Section 122 of the *Restatement of Security. See* Reporter's Notes to *Restatement of Suretyship,* § 39.

The facts of *Gholson v. Savin,* 137 Ohio St. 551, 31 N.E.2d 858 (1941), are also illustrative. There, Gholson leased property to Savin. Thereafter, Garber assumed Savin's lease. Garber defaulted on the lease, and Gholson brought separate actions against Garber and Savin for the full amount of the rent due. Gholson settled with Garber for an amount less than the full amount due and explicitly reserved his rights against Savin in the release. In reversing judgment for Gholson, the Ohio Supreme Court determined that upon assignment of the lease, Garber assumed primary liability on the lease, and Savin became a surety with a right of indemnity against Garber for any judgment. *Id.* at

862. The court then held that "it was the intention of the parties to release Garber unqualifiedly from further liability. If he was so released, Savin was, likewise, released." *Id.* at 863.

The merger clause in the Superseding VLT Agreement, much like the release in *Gholson,* released GTECH from all of its obligations under the Binding Agreement. Thus, as a matter of law, since Penn National did not reserve its rights against AmTote, and AmTote did not consent to remain liable for the $500,000 grant obligation, AmTote, as surety for the Binding Agreement provisions assigned to GTECH, was released from those same obligations.

The *Restatement of Suretyship* describes those circumstances in which a releasor may show that it intends to preserve its right against the surety:

This intent can be manifested in a provision of the release effecting a preservation of recourse of the secondary obligor or otherwise indicating that the secondary obligor remains liable, or inferred from circumstances that indicate such intent. In the absence of such a provision or such circumstances, of course, the secondary obligor is discharged.

*Restatement of Suretyship* § 39, cmt. D.

Penn National manifested no such intent in its release of GTECH, nor was such an intent inferrable. The negotiations preceding the execution of the Superseding VLT Agreement did not include any discussion concerning Penn National's retention of its rights against AmTote. Thus, as a matter of law, AmTote was released as well.

The absence of any explicit reference to the $500,000 grant provision in the Superseding VLT Agreement does not prevent the operation of the release as a matter of law. As the *Restatement of Suretyship* makes clear, the release of the principal and surety discussed in Section 39(b)

applies not only to situations in which the obligee grants a formal release to the principal obligor, but also to any agreement that has the effect of freeing the principal obligor of any enforceable duty to the obligee. Thus, this section applies when an obligee agrees never to seek enforcement of the underlying obligation, even if, strictly speaking, the underlying obligation is not released. To hold otherwise would be to exalt form over substance.

*Restatement of Suretyship* § 39, cmt. I.

Here, the circumstances surrounding the execution of the Superseding VLT Agreement clearly support the finding that the obligation was intended to be released. As noted above, GTECH and Penn National discussed and rejected Penn National's request that the $500,000 grant obligation be maintained in the Superseding VLT Agreement.

A release of a principal had a similar effect of releasing a surety in *Gunnell Const. Co. v. Hartford Acc. & Indem. Co.*, 374 F.2d 278 (D.C.Cir. 1966). In *Gunnell*, a general contractor and subcontractor filed claims against one another for breach of the subcontract. After the parties dismissed their claims with prejudice, the general contractor sued the subcontractor's surety. The District of Columbia Circuit affirmed the trial court's grant of summary judgment for the surety, holding that "the unconditioned praecipe filed in the District Court action, . . . unqualifiedly discharged [the principal] . . . thus by operation of law discharging its surety in connection with the same matter." *Id.* at 280.

Here, as in *Gunnell*, GTECH and Penn National dismissed with prejudice all of their claims against each other. Penn National thus discharged GTECH from all of its obligations under the Binding Agreement. This discharge, as a matter of law, also discharged AmTote from the assigned obligations in the Binding Agreement.

## D. LIQUIDATED DAMAGES

Penn National displaced AmTote and ceased making payments under the Wagering Services Agreement in March 1998. On April 3, 1998, AmTote provided defendants with notice of their defaults and an opportunity to remedy the defaults. Letter from Michael Fucheck to Richard Moore, 4/3/98. When defendants failed to cure the defaults or otherwise respond, AmTote terminated the Wagering Services Agreement pursuant to Section 15.2 of the Wagering Services Agreement and demanded, pursuant to the same paragraph, liquidated damages in the amount of $1,807,325.24. Letter from Michael Fucheck to Richard Moore, 5/8/98.

Section 15.2 of the Wagering Services Agreement provides that, in the event of a default and termination thereunder, the track "shall pay to AmTote as liquidated damages for breach of this Agreement for each Operating Year or portion thereof remaining in the term of this Agreement at the date of such termination, an amount equal to the total service fees paid by [Penn National] to AmTote during the twelve (12) months preceding such termination."

As of the date of termination, May 8, 1998, there were seven whole or partial years remaining on the term of the Wagering Services Agreement, as amended. The total service fees paid by Penn National to AmTote from May 9, 1997 to May 8, 1998, the twelve months preceding the termination, were $258,189.32. Affidavit of David Moore, May 24, 1998. Multiplying that figure times the seven years, or portions thereof, remaining in the term of the agreement as of the time of the May 8, 1998 termination yields the total liquidated damages due of $1,807,325.24.

The Wagering Services Agreement is governed by the laws of the State of West Virginia per Section 30 thereof. Under West Virginia law, an award of liquidated damages shall include, as a matter of law, prejudgment interest at the

rate of ten percent. W. Va.Code § 56–6–31 (1999); *Beard v. Lim,* 185 W.Va. 749, 408 S.E.2d 772 (1991). The statute applies in federal courts deciding diversity cases applying West Virginia law. *Hitachi Credit America Corp. v. Signet Bank/Virginia,* 166 F.3d 614, 633 (4th Cir.1999) (in a diversity action, state law controls right to recover prejudgment interest); *Kosnoski v. Howley,* 33 F.3d 376 (4th Cir.1994) (under W. Va.Code § 56–6–31, prejudgment interest is mandatory and is calculated from the date the claim accrued); *Eriksen Const. Co., Inc. v. Morey,* 923 F.Supp. 878 (S.D.W.Va., 1996) (10% prejudgment interest on special or liquidated damages is mandatory in breach of contract case).

Therefore, the Court will add to the liquidated damages award in this case prejudgment interest at the rate of ten percent from the date of the May 8, 1998 termination notice to the date of judgment.

Title 28, United States Code § 1961 provides for post-judgment interest on any money judgment awarded by a district court. 28 U.S.C. § 1961(a). The statute provides that such interest shall be calculated from the date of judgment and shall be based on the average accepted auction price for 52–week U.S. Treasury bills. *Id.*

The award of post-judgment interest at the legal rate applies to AmTote's liquidated damages, and to the prejudgment interest. *Quesinberry v. Life Ins. Co.,* 987 F.2d 1017, 1031–32 (4th Cir.1993) (holding that post-judgment interest is to be paid on prejudgment interest).

## IV. CONCLUSION

The Court holds that AmTote's contract to provide tote services to the Track extended for seven years upon passage of the 1996 Referendum approving video lottery at the Track. The seven-year term commenced on or about September 15, 1997, upon the installation and initial operation of video lottery terminals at the Track. Penn National breached that contract by displacing AmTote as the tote service provider at the Track.

This Court further holds that AmTote's damages are to be measured by the liquidated damages provision contained in Section 15.2 of the Wagering Services Agreement. At the time that AmTote rightfully terminated that contract there were seven years, or portions thereof, remaining on the term of AmTote's contract. The Court grants AmTote judgment in its favor on Count 1 of the Amended Complaint, in the amount of $1,807,325.24, plus prejudgment interest at the rate of 10% from May 8, 1998 to the date of Judgment herein and post-judgment interest at the statutory rate from the date of Judgment until satisfied.

Furthermore, this Court holds that Penn National released GTECH from the $500,000 Grant Obligation and that this release, as a matter of law, discharged AmTote from this obligation. The Court will grant AmTote and GTECH judgment on Count III of the Amended Complaint and dismiss Penn National's Counterclaim with prejudice.

It is therefore **ORDERED**

1. That AmTote is **GRANTED** Summary Judgment on its motion (Document No. 126) against the defendants Penn National Gaming, Inc. and PNGI Charles Town Gaming Limited Liability Company;

2. That AmTote is awarded liquidated damages in the sum of $1,807,325.24 plus prejudgment and post judgment interest as set forth above until paid in full by the defendants Penn National Gaming, Inc., and PNGI Charles Town Gaming Limited Liability Company;

3. That AmTote is **GRANTED** judgment on Count III of the Amended Complaint and that Penn National's Counterclaim be **DISMISSED** with prejudice;

4. That, there remaining nothing to consider as to GTECH, this party be **DISMISSED** as a party herein.